**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-2931 |
| | § | |
| APACHE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This case involves two oil-production platforms located off the Louisiana coast. The plaintiff, W&T Offshore, Inc. ("WTI"), owns the South Timbalier 229 platform ("ST-229"). WTI and Apache Corporation entered into a Production Handling Agreement ("PHA") under which Apache processed WTI's oil from the ST-229 platform. Apache processed the oil along with oil that it produced on its Grand Isle 116 platform ("GI-116"). The PHA required Apache to allocate the oil it processed between it and WTI. In this suit, WTI alleges that Apache breached the PHA by misallocating the oil processed under that contract. WTI also alleges that Apache committed fraud and other state-law torts by misrepresenting how it made the allocations and by concealing misallocations. (Docket Entry No. 27).

WTI filed this suit in Texas state court in July 2011. Apache timely removed on the basis of subject-matter jurisdiction under the Outer Continental Shelf Land Act ("OCSLA"), 43 U.S.C. §§ 1331, 1349(b)(1). (Docket Entry No. 1). Apache has moved to dismiss WTI's second amended complaint, (Docket Entry No. 28). WTI responded, (Docket Entry No. 29); Apache replied, (Docket Entry No. 32); and WTI surreplied, (Docket Entry No. 33).

Based on the pleadings and related submissions, the motion to dismiss, and the relevant law, this court grants in part and denies in part Apache's motion to dismiss. The motion to dismiss is granted as to WTI's claims for conversion, negligent misrepresentation, and gross negligence because Louisiana law applies and precludes those claims. The motion to dismiss is denied as to the fraud claim because the pleadings are an inadequate basis to conclude that, as a matter of law, limitations bars the claim. The motion to dismiss is also denied as to estoppel, attorney's fees, and exemplary damages because they are remedies rather than separate claims for relief.

The reasons for these rulings are explained below.

I.      **Background**[1]

Apache owns and operates the GI-116 offshore oil-production platform; WTI owns and operates the ST-229 platform. Both are off the Louisiana coast on the Outer Continental Shelf ("OCS"). Under the parties' PHA, effective June 1, 2005, WTI delivered what it produced from the well on ST-229 — a mixture of oil and water — to Apache's processing facility on GI-116 via subsea pipelines. Apache would separate the oil from the water, return the oil to WTI, and dispose of the excess water for a fee. Apache also processed its own production at the GI-116 facility. The production from both Apache and WTI wells was commingled at the Apache GI-116 facility. The PHA required Apache to allocate the oil processed between itself and WTI. Each barrel of oil not allocated to one was necessarily allocated to the other.

---

[1] Unless otherwise noted, these facts are taken from WTI's second amended complaint and the exhibits attached to it, (Docket Entry No. 27).

The PHA required Apache to allocate the processed oil between itself and WTI in a "consistent and equitable manner"[2] and to maintain and provide access to documents supporting the allocation. Apache was responsible for testing the volumes of oil and water its processing produced. WTI installed a proportional-to-flow sampler, known as a "YZ sampler," on the separator designated for WTI. The PHA, consistent with various provisions of federal law, states that YZ samplers are the only approved method for determining the allocations. WTI claims that less reliable allocation methods, such as centrifugal "shakeouts," were impermissible under the PHA and federal law. The PHA also included provisions giving WTI the right to access and audit Apache's records on the production allocation and on billing. The PHA also gave WTI the right to have a third party inspect and verify the allocations.

WTI includes the following allegations in the second amended complaint:

- Apache was consistently underallocating oil to WTI and overallocating water to Apache;

- Apache failed to pay it for oil that WTI had produced and had charged WTI fees to process water that was not present;

- Apache ignored its obligations as a processor to test, sample, measure, allocate, and account for the parties' respective productions;

- Apache based the allocations on the shakeout method, misrepresented the number of shakeouts it was performing, did not actually perform the shakeouts as represented, and when the shakeouts were performed, manipulated the tests so as to understate the amount of oil and overstate the amount of water;

---

[2] Specifically, the PHA states: "All of [Apache]'s and [WTI]'s meter calibrations and volume allocations for hydrocarbon volumes flowing to [GI-116] will be treated in a consistent and equitable manner and as necessary, all documentation will be forwarded to the appropriate designated personnel for each of the [p]arties." (Docket Entry No. 27, Ex. A, Production Handling Agreement, ¶ 6.11).

3

- Apache took some samples from the YZ sampler but did not use them for allocation purposes;

- Apache concealed those samples when WTI asked for them;

- Apache failed to maintain or repair the YZ sampler as required by the PHA, and did not inform WTI when it simply stopped using the YZ sampler altogether; and

- Apache misrepresented or failed to disclose material facts about various other aspects of the allocations and the attempted audit.

In April 2007, WTI installed its own processing equipment on ST-229. This new processing equipment did much of the work previously done on GI-116. After July 31, 2007, WTI stopped sending production to GI-116 on a daily basis.

In late 2007, WTI asked for an audit of Apache's performance under the PHA. In October 2007, WTI auditors in Houston asked for testing and sampling reports. Apache's Houston representatives gave WTI one spreadsheet of water readings and three YZ sampler readings, with no supporting documents. On November 2, 2007, WTI told Apache that the information was insufficient. WTI claims that in December 2007, Apache agreed to provide additional documents. But in September 2008, Apache told WTI that the spreadsheet of water readings was all that Apache would provide and that it was sufficient for WTI to verify the allocations. WTI hired a third-party auditor to try to determine the basis for Apache's allocations.

That audit did not satisfy WTI's concerns. WTI also tried to calculate, based on its own estimates and measurements, the volumes it claims Apache should have allocated. WTI could not square the numbers with Apache's documents. According to calculations WTI sent Apache in November 2007 and again in January 2008, by WTI's estimates, Apache owed WTI over $9.7 million for misallocating the oil and water processed under the PHA.

4

In correspondence to WTI dated April 4, 2008, Apache's internal auditor stated that Apache had used eight daily shakeouts since around April 2006 to calculate the oil and water allocated to WTI's production.  WTI claims that this was false because internal communications from January 2011 to April 2011 written and received by Apache's audit and accounting personnel in Houston show that the allocations had not originally been based on the shakeouts at all.  Instead, the 2006 allocations were "adjusted" in 2011 to conform to the shakeouts.  WTI claims in the alternative that if Apache did in fact use the shakeouts to allocate production, that violated the PHA and federal-law requirements that the YZ sampler — not shakeouts — be used.  WTI points out that it had not consented to alternative sampling methods.

WTI claims that Apache discovered certain underallocations during the audit process but neither paid the admitted underallocations nor explained its reasons for not doing so.  WTI claims that Apache may be withholding such communications on the basis of an erroneous assertion of privilege.  WTI alleges that Apache still has not explained how it calculated the original allocation figures used to pay WTI for its production and has retained in Apache's exclusive possession, custody, or control evidence of these misrepresentations and failures to disclose.

WTI filed suit on July 6, 2011 in the Harris County District Court for the 127th Judicial District.  WTI asserted Texas state-law claims for breach of contract, unjust enrichment, negligence, fraud, and conversion and sought actual and punitive damages, attorneys' fees, and a declaratory judgment that Apache had failed to perform its duties under the PHA and was required to comply with its payment and other contractual obligations.  (Docket Entry No. 1, Ex. B, Pl.'s Orig. Pet.).  Apache simultaneously answered, asserted several affirmative defenses — including the statute of limitations, waiver and equitable estoppel, laches, and failure to mitigate — and removed the case

to the United States District Court for the Southern District of Texas based on federal-question jurisdiction.  Apache did not invoke 28 U.S.C. § 1331, the general federal-question jurisdiction statute.  Rather, it stated that "[t]he underlying state court action arises under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1) and, therefore, removal is proper pursuant to 28 U.S.C. § 1441(a)–(b)."  (Docket Entry No. 1, ¶ 2).  On April 26, 2012, Apache counterclaimed against WTI for breach of contract and negligence or, in the alternative, to recover the value of oil improperly allocated to WTI instead of Apache.  (Docket Entry No. 17).

On June 28, 2012, WTI filed its second amended complaint,[3] asserting claims for breach of contract, negligent misrepresentation and gross negligence, fraud, and conversion, and seeking declaratory relief and an accounting, exemplary damages, and estoppel.  WTI also invoked the discovery rule to toll any applicable statute-of-limitations affirmative defense Apache might raise.  (Docket Entry No. 27).  This motion to dismiss the second amended complaint followed.

In the motion to dismiss, Apache argues that, under OCSLA, Louisiana law applies to all of WTI's claims.  Apache argues that WTI's estoppel, exemplary damages, and negligence claims are

---

[3]  On April 27, 2012, WTI filed its first amended complaint, asserting causes of action for breach of contract, unjust enrichment, negligence, fraud, and conversion.  WTI also sought a declaratory judgment and an accounting.  Under the heading, "Estoppel," WTI asked this court to "bar[ ] and estop[ ] [Apache] from presenting any new records or taking any position inconsistent with the information produced to WTI in connection with the audit."  (Docket Entry No. 18, ¶ 43).

On May 11, 2012, Apache moved to dismiss WTI's first amended complaint.  Apache argued that Louisiana law applied and that, under Louisiana law, WTI could not bring unjust enrichment and negligence claims for an alleged breach of the parties' contract, the PHA.  Apache also argued that WTI's fraud claim failed the heightened pleading required under Rule 9(b) of the Federal Rules of Civil Procedure, and that WTI's requests for the remedies of estoppel, exemplary damages, and attorneys' fees were unavailable under Louisiana law.  (Docket Entry No. 19).  WTI responded to that motion, (Docket Entry No. 22), and Apache replied, (Docket Entry No. 23).  After WTI filed an unopposed motion to amend its complaint, (Docket Entries No. 24, 25), this court granted the motion to amend and denied as moot Apache's motion to dismiss, (Docket Entry No. 26).

barred as a matter of Louisiana law, which does not recognize a cause of action for equitable estoppel, has no statute authorizing exemplary damages in a case of this nature, and bars tort claims based on breach of a contractual duty.  Apache also argues that Louisiana's one-year prescriptive period for tort claims applies and that WTI discovered the alleged misallocations more than four years before it filed suit.  (Docket Entry No. 28, at 2).

WTI responds that Texas law, not Louisiana law, applies to its tort claims.  WTI argues that actions underlying the tort claims, and their effects, took place in Houston and were not directly related to the development of minerals on the OCS.  WTI argues that the negligence claims are independent of the parties' PHA because they arise from Apache's later failure to exercise ordinary care in communicating and disclosing truthful information.  WTI asks this court to apply judicial estoppel to prevent Apache from taking positions in this suit inconsistent with its earlier actions.  Finally, WTI argues that regardless of whether Texas or Louisiana law applies to the tort claims, those claims were brought within any applicable limitations or prescriptive period.   In the alternative, WTI argues that Apache's conduct tolled limitations.  (Docket Entry No. 29).

Apache replies as follows:

Two issues drive the resolution of this motion.  The first issue is whether OCSLA governs WTI's tort claims.  If it does, Louisiana law applies to this dispute, based on OCSLA's choice-of-law provision.   Under Louisiana law, WTI's exemplary damages claim is barred, and the one-year prescription period for WTI's tort claims has expired.  The second issue is whether WTI can avoid Louisiana's one-year prescription period, even though WTI admits in its complaint that it had actual knowledge of its alleged injury in April 2007, more than four years before it filed suit, and that it had actual knowledge of its alleged $9.7 million in damages just a few months later.

(Docket Entry No. 32, at 1).  Apache argues that because "[t]he 'development' of minerals expressly includes onshore activities related to that development," WTI's tort claims are governed by

Louisiana law under OCSLA.  (*Id.*)  Apache argues that neither the alleged misrepresentations nor

the "continuing tort doctrine" tolls limitations.  (*Id.* at 9).  Apache also argues that even if Texas law

and its four-year (for fraud) and two-year (for other torts) limitations periods apply, WTI's tort

claims were filed too late.  (*Id.* at 10).  Apache argues that "WTI's gross negligence claim, under

both Louisiana and Texas law . . . cannot be based solely on the breach of a contractual duty."  (*Id.*

at 11).

WTI filed a surreply "to address certain issues raised for the first time" in Apache's reply.

(Docket Entry No. 33, at 1).  WTI takes issue with the cases Apache cited as support for the

proposition that OCSLA's jurisdictional provision means that WTI's tort claims were covered by

Louisiana law.  WTI also argues that Apache improperly sought "to apply the breach of contract

facts to the tort claims in both its argument based on OCSLA jurisdiction and its argument based

on prescription and/or statutes of limitations, focusing on the contractual misallocations rather than

Apache's tortious misrepresentations.  WTI's contract and tort claims are distinct causes of action,

which warrant separate consideration."  (*Id.* at 5).

The parties' arguments are discussed below.

## II.      The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be

granted."  FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, — U.S. —, —, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* The federal pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of cause of action will not do." *Id.* (internal quotation marks and citation omitted).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also Richardson v. Keffer*, 471 F. App'x 304, 305 (5th Cir. 2012) ("Although Rule 15 requires leave to be freely given, 'leave to amend . . . is by no means automatic.'" (quoting *Rourke v. Thompson*, 11 F.3d 47, 51 (5th Cir. 1993))); *Mosley v. Bowie County*, 275 F. App'x 327, 328 (5th Cir. 2008) ("The record is devoid of reasons for the denial of leave to amend the complaint; accordingly, the denial of such leave constitutes and abuse of discretion."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (citation omitted)). A plaintiff, however, should be denied leave to amend a complaint if the court determines that the "proposed amendment . . . clearly is frivolous" or "advanc[es] a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed. 2010); *see also Rio Grande Royalty Co.*

*v. Energy Transfer Partners*, 620 F.3d 465, 468 (5th Cir. 2010) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss."); *Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

## III.  Choice of Law under OCSLA

"OCSLA extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler." *Texaco Exploration & Prod. Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 772 (5th Cir. 2006) (citing 43 U.S.C. § 1333).  "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations . . . the civil and criminal laws of each adjacent State . . . are . . . the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."  43 U.S.C. § 1333(a)(2)(A).  Three requirements must be met for state law to apply as surrogate federal law under OCSLA:

> (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artific[i]al structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

*Union Tex. Petrol. Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

"The situs of the controversy in a contractual dispute depends on the focus of the contract." *ACE Am. Ins. Co. v. M–I, L.L.C.*, 699 F.3d 826, 830 (5th Cir. 2012).  A contractual dispute "arises under an OCSLA situs if a majority of the work called for by the contract is on stationary platforms or other enumerated OCSLA situses."  *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d

10

778, 787 (5th Cir. 2009) (en banc); *see also Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1229 (5th Cir. 1985) ("We think it reasonably clear that a contract dispute, such as the one presented here, arising out of the allegedly improper partial construction of a fixed platform falls well within the range of legal controversies Congress expected and intended to be submitted to the district court for resolution under the Act."); *Energy XXI, GoM, LLC v. New Tech Eng'g, L.P.*, 2011 WL 11197, at *3 (S.D. Tex. Jan. 3, 2011) ("[T]he breach of contract claim . . . arose on an OCSLA situs because the majority of the work to be performed under the MSA was likely 'on stationary platforms or other enumerated OCSLA situses.'" (quoting *Grand Isle*, 589 F.3d at 787)).

In *Grand Isle*, the en banc Fifth Circuit explained that "in a tort action . . . the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A)." 589 F.3d at 784 (citing *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 353, 355 (1969)). "The converse is equally clear. . . . [I]f [a] tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met." *Id.* (citing *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 209 (1986) (holding that OCLSA did not make Louisiana law surrogate federal law when a helicopter ferrying platform workers home crashed into the Gulf of Mexico, killing two platform workers)); *see also Rodrigue*, 395 U.S. at 366 (holding that OCSLA makes state law surrogate federal law for "accidents actually occurring on the [artificial] islands.").

Earlier Fifth Circuit cases, however, explain that "*Rodrigue* is not limited to harm occurring on the fixed platform itself." *AmClyde*, 448 F.3d at 773–74 (holding that a platform-construction accident in which a crane dropped a piece of the platform into the ocean occurred on an OCSLA situs); *see also Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 286 (5th Cir. 2009) (holding

that a platform worker's death after the helicopter he was in skidded off the platform's deck and into

the Gulf of Mexico occurred on an OCSLA situs); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1110 (5th

Cir. 1982) ("[W]e have applied OCSLA and, consequently, state law, to incidents in which platform

workers who were the victims of torts originating on these artificial islands were not actually injured

or killed until they fell, jumped, or were pushed into the surrounding seas."); *In re Dearborn*, 499

F.2d 263, 273 (5th Cir. 1974) ("Congress did not intend that application of state law necessarily

should cease at the physical boundaries of the platform.  The same concerns may be equally

applicable to accidents fortuitously consummated in the surrounding sea.").  *Grand Isle*, which did

not involve tort claims, did not address this line of cases in presenting its choice-of-law analysis for

tort claims.

Apache attempts to reconcile this apparent case-law inconsistency by referring to 43 U.S.C.

§ 1349(b)(1), which establishes federal subject-matter jurisdiction over certain cases involving the

OCS.  Apache argues that this grant of subject-matter jurisdiction extends the reach of state law as

surrogate federal law to tort claims such as WTI's.  Apache argues:

> OCSLA subject matter jurisdiction applies to all disputes "arising out of, or in
> connection with" any operation involving the "development" of minerals on the
> OCS. . . . WTI's [tort] claims . . . unquestionably "arise out of" and are "in
> connection with" operations of the OCS. . . . Under OCSLA, only federal law or the
> adjacent-state's law can govern this dispute.

(Docket Entry No. 32, at 3, 5 (quoting 43 U.S.C. § 1349(b)(1)(A))).  Apache responds to WTI's

argument that the tort claims do not arise generally from oil production on the OCS but instead from

Apache's "'failure to provide complete and accurate information,'" as follows:

> WTI's claims are based on, and seek damages for, the purported misallocation of oil
> produced on the OCS. . . . [as well as] damages for certain incidental expenses,
> which it claims it incurred because of the alleged misallocations. . . . The mere fact
> that WTI alleges that misrepresentations related to the allocations were made

> onshore cannot sever the connection between the claims in this case and the allocation of oil and other activities on the OCS.

(Docket Entry No. 32, at 3, 4 (quoting Docket Entry No. 29, at 8)).  Apache appears to argue that the OCSLA choice-of-law provision applies because the OCSLA jurisdictional provision applies, and that the choice-of-law provision must be interpreted as broadly as the jurisdictional provision.

Apache's approach to § 1333(a)(2)(A) appears somewhat overbroad.  One aspect of the argument is that OCSLA covers not only activities that take place on the Outer Continental Shelf, but also covers "'the operation of all onshore support facilities, . . . which are for the purpose of ultimately producing the minerals discovered.'"  (Docket Entry No. 28, at 7 (quoting 43 U.S.C. § 1331(*l*))).  The phrase from § 1331(*l*) that Apache quotes defines "development."  43 U.S.C. § 1331(*l*)).  But that phrase appears in OCSLA's expansively worded jurisdictional provision, § 1349(b)(1), not in § 1333(a)(2)(A), the choice-of-law provision.

Apache quotes the Supreme Court's opinion in *Rodrigue* in arguing that "[d]etermining that OCSLA governs a dispute is decisive for the choice-of-law inquiry, because OCSLA's choice-of-law provision acts 'to define a body of law applicable' to all claims within OCSLA jurisdiction."  (Docket Entry No. 28, at 5 (quoting 395 U.S. at 355)).  The full context of the *Rodrigue* quote is as follows:

> The purpose of the Lands Act was to define a body of law applicable *to the seabed, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf.*  That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the Act.

*Rodrigue*, 395 U.S. at 355–56 (emphasis added).  This context makes it clear that the OCSLA choice-of-law provision is limited to the physical locations specified.

Courts within the Fifth Circuit generally agree that the question of what body of law to apply is separate from the question of whether OCSLA provides subject-matter jurisdiction in a particular case. *See, e.g.*, *AmClyde*, 448 F.3d at 771 n.6 ("[I]n determining whether OCSLA grants subject matter jurisdiction, the statute's choice of law provision is not at issue."); *Recar v. CNG Producing Co.*, 853 F.2d 367, 370 (5th Cir. 1988) ("[W]e are not called upon at this time to decide which body of law applies to this case. The district court will make this determination based upon principles articulated in a number of cases that have considered this question . . . . The sole question presented to us in this appeal is whether OCSLA invests the district court with original federal question jurisdiction."); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 747 F. Supp. 2d 704, 709 n.1 (E.D. La. 2010) ("Plaintiff's argument[ ] related to OCSLA § 1333 is not applicable to whether this Court has jurisdiction in this matter [under § 1349(b)]."); *see also Phillips v. BP PLC*, 2010 WL 3257740, at *4 (N.D. Fla. July 30, 2010) ("Selection of substantive law for a federal enclave [under § 1333(a)] is [a] distinct legislative act from conferring district court subject matter jurisdiction [under § 1349(b)].").

One case, *EP Operating L.P. v. Placid Oil Co.*, 26 F.3d 563 (5th Cir. 1994), stated that "the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333." *Id.* at 569. The issue in *EP*, however, was whether there was OCSLA subject-matter jurisdiction based on OCSLA's choice-of-law provision. *See id.* State law undisputedly applied as surrogate federal law because the dispute involved resolving property interests in a defunct offshore rig. *Id.* at 565. The defendants argued that § 1349 could not provide subject-matter jurisdiction because the subject rig was not currently productive and the "action would not affect any 'operation' on the OCS." *Id.* at 566. The *EP* court rejected that argument, holding instead that, consistent with

14

§ 1333's situs requirement, § 1349 extends the judicial power of the United States "to the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf." *Id.* at 569; *see also In re BP P.L.C. Sec. Litig.*, 2012 WL 4739673, at *5 (S.D. Tex. Oct. 1, 2012) ("*[EP]* confirmed that the reach of section 1349(b)(1) is at least as extensive as section 1333.  But it did not resolve the question of whether section 1349(b)(1) might reach further than section 1333."). In light of the precedents, Apache's suggestion that Louisiana law applies solely because WTI's claims might fall under § 1349 appears overbroad.

The other facet of Apache's argument is that this court should interpret § 1333 in a way that mirrors the § 1349 analysis.  Apache directs this court's attention to the *AmClyde* opinion, in which the court held that damages caused when the defendant dropped part of an oil rig under construction into the ocean gave rise to jurisdiction under § 1349(b):

> OCSLA's broad grant of jurisdiction to the federal courts over cases arising out of the development of the seabed is not curtailed simply because the South Deck Module was in motion at the time of the crane or wire rope's failure.  The deck module was already at the development site and was merely being moved by crane from the materials barge into its place on the fixed compliant tower, rather than being transported point-to-point across the sea.

448 F.3d at 770.  The court reiterated that "this Circuit has consistently read OCSLA's jurisdictional grant broadly." *Id.* (citing *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 156 (5th Cir. 1996); *EP*, 26 F.3d at 569; *Recar*, 853 F.2d at 369).  Subject-matter jurisdiction under OCSLA was proper because "the harm alleged by Texaco arises directly from the construction of the . . . tower, a fixed platform expressly covered by OCSLA's terms, and would not have occurred but for the development of the Outer Continental Shelf in the form of the . . . tower's construction." *Id.* at 669. The court went on to hold that OCSLA's choice-of-law provision made state law surrogate federal law in part because the controversy arose on an OCSLA situs. *Id.* at 774 (citing *PLT*, 895 F.2d at

15

1047).  "[T]he complaint arises on an OCSLA situs because the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development."  *Id.*  Apache argues that "[t]o determine whether a tort action arises on an OCSLA situs, courts apply the same 'but for' test used to determine OCSLA jurisdiction."  (Docket Entry No. 28, at 7 (citing *AmClyde*, 448 F.3d at 774)).

Apache's proposed approach to this facet of its argument also appears somewhat overbroad. The "but for" jurisdictional test in the Fifth Circuit is generally not seen as having a situs requirement.  *See, e.g.*, *In re BP Sec. Litig.*, 2012 WL 4739673, at *4 ("Section 1349(b)(1) does not have an OCS situs requirement." (emphasis omitted)).[4]  The Fifth Circuit has not specifically addressed whether "but-for" is the proper jurisdictional test.  As a means of interpreting § 1333(a)(2)(A), however, a pure "but-for" approach would create tension with precedent.  First, it would appear inconsistent with *Grand Isle*, which indicated a clear situs requirement for OCSLA's

---

[4]  *See also In re Oil Spill*, 747 F. Supp. 2d at 709 n.1 ("[N]either the Supreme Court nor the Fifth Circuit has held that the situs requirement has to be satisfied for jurisdiction to be proper under § 1349."); *Phillips*, 2010 WL 3257740, at *1–6 (surveying Fifth Circuit case law and concluding that the jurisdictional provision does not include a situs requirement); *see also Landry v. Island Operating Co.*, 2009 WL 3241560, at *4 (W.D. La. Sept. 30, 2009) (viewing § 1349 as a "catch-all jurisdictional grant" that might apply even when the situs requirement is not met).  *But see Golden v. Omni Energy Servs. Corp.*, 242 F. App'x 965, 967–68 (5th Cir. 2007) (per curiam) ("For OCSLA jurisdictional purposes, [the] cases compel the district court to take into account the location of incidents giving rise to the lawsuit.  Here, the undisputed facts show that the helicopter accident giving rise to Golden's lawsuit did not occur on the Continental Shelf.  The helicopter crash instead occurred in a field near Mouton Cove, Louisiana.  Therefore, the district court cannot exercise jurisdiction over [the] instant lawsuit under OCSLA."); *Mississippi ex rel. Hood v. Gulf Coast Claims Facility*, 2011 WL 5551773, at *4–5 (S.D. Miss. Nov. 15, 2011) (recognizing that although the Fifth Circuit applies the "but-for" test, § 1349 jurisdiction was absent because the defendant's Dublin, Ohio–based activities developing standards for claims-processing "amount[ed] an operation, [but] that operation is not conducted 'on the outer Continental Shelf.'" (quoting 43 U.S.C. § 1349(b)(1))).  *But see Phillips*, 2010 WL 3257740, at *6 ("*Golden* is probably wrongly decided as it conflates the substantive law issue of § 1331(*l*) with the subject matter jurisdictional issue of § 1349(b)(1).").

choice-of-law provision to apply. Although some confusion remains over the proper analysis of the situs requirement for tort claims, *Grand Isle* reaffirmed precedent in this circuit that state law acts as surrogate federal law only in controversies arising on an OCSLA situs. *See* 589 F.3d at 784–85, 787; *see also Tallentire*, 477 U.S. at 219 (finding OCSLA's choice-of-law provision inapplicable, even though the accident in that case would not have arisen but for the need for transportation off an offshore oil rig). And even in earlier cases applying the OCSLA choice-of-law analysis outside the physical boundaries of platforms, the Fifth Circuit has required more than "but-for" causation. In *AmClyde*, for example, the court stated that "the complaint arises on an OCSLA situs because the claims are *inextricably linked to the construction of a platform* permanently fixed to the Shelf . . . *and* would not have arisen but for such development." 448 F.3d at 774 (emphasis added). The fact that § 1333(a)(2)(A) includes "situs" language while § 1349(b)(1) does not may also suggest that "but-for" causation is insufficient for the OCSLA choice-of-law inquiry. *See, e.g.*, *In re BP Sec. Litig.*, 2012 WL 4739673, at *5 ("The fact that section 1333 contains a situs requirement only underscores that, if Congress meant for section 1349(b)(1) to contain a situs requirement, it knew how to include one." (citing *Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 688 (2012)). Apache's approach — that a "but-for" test applies to determine whether state law acts as surrogate federal law — again appears somewhat overbroad.

These uncertain aspects of the OCSLA application under Fifth Circuit law do not determine the outcome of the present motion to dismiss. The claims that Apache moves to dismiss sound in tort, but they are all contract-based claims. Although many of the alleged statements or acts giving rise to the tort claims took place in an office building in Houston, the statements and acts relate to the work done under the parties' PHA contract. WTI's complaint makes clear that the majority of

the work contemplated in the PHA, including the work giving rise to the alleged tort claims and damages, *was* performed on an OCS situs, the Apache platform.  That work and the alleged resulting damages involve the alleged misallocation of WTI's oil, the installation of the heater/treater that WTI claims it installed because of Apache's misappropriations, and the alleged conversion of WTI's oil.  All these occurred on an OCS situs: an offshore platform.

WTI alleges tortious acts during the auditing process.  But WTI has not alleged or argued that the acts during that auditing process concerned anything but WTI's operations on the OCS, or resulted in damages separate from those arising from the parties' contractual relationship and Apache's alleged breach of that relationship.

WTI's argument that Apache breached a freestanding, independent duty not to make misrepresentations or to commit fraud is unpersuasive as an argument about OCSLA choice-of-law. It is instead an argument about whether the alleged breach of the PHA can give rise to independent torts.  The events underlying several of the alleged torts may have taken place on land, in Houston. But the analysis under the OCSLA choice-of-law provision asks whether the "controversy . . . ar[ose]" on the OCS, *PLT*, 895 F.2d at 1047, not whether all the acts giving rise to the controversy arose on the OCS.  Disputes over the performance of offshore production contracts arise on the OCS.  *See Grand Isle*, 589 F.3d at 787.  Disputes over the allegedly negligent or fraudulent performance of such contracts also arise on the OCS.

The parties' PHA applied to the development of resources from platforms on the OCS. Louisiana law applies as surrogate federal law under OCSLA.  WTI concedes that the conduct giving rise to the breach of contract took place on the offshore platform.  WTI simply adds that acts arising from the same conduct or relating to the same conduct, and giving rise to tort as well as

contract claims, occurred in Houston.  WTI's view of the situs requirement is overly narrow.  The situs requirement is satisfied where, as here, the *controversy* arises on the OCS.  *See PLT*, 895 F.2d at 1047.  In sum, Louisiana law applies as federal law to WTI's claims, whether they are framed as tort or contract claims.

## IV.    The Motion to Dismiss

The next step is to determine whether, under Louisiana law, the tort claims are subject to dismissal.  Apache has not moved to dismiss the breach of contract claim at the heart of this lawsuit. Apache has moved to dismiss WTI's claims for conversion, negligent misrepresentation and gross negligence, fraud, estoppel, exemplary damages, and attorney's fees.  The parts of the second amended complaint asserting estoppel, exemplary damages, and attorney's fees are more in the nature of remedies than causes of action.  Apache's motion to dismiss these claims is denied, without prejudice, on the present record.  The specific tort claims are analyzed separately below.

### A.    The Negligence Claim

Apache argues that WTI's negligence claim must be dismissed because it is based on the nonperformance or negligent performance of contractual duties.  In Louisiana, "[t]he law is clear that where a party has been damaged by conduct arising out of a contract, he may have a right to seek damages in both tort and for breach of contract."  *Jumonville v. White*, 992 So. 2d 1044, 1046 n.1 (La. App. 1st Cir. 2008) (citing *Edmond v. Webre*, 413 So. 2d 306, 308 (La. App. 3d Cir. 1982)); *see also Waller & Edmonds v. Cockfield*, 35 So. 778, 780 (La. 1904); *Chronister v. Creole Corp.*, 147 So. 2d 218, 220 (La. App. 4th Cir. 1962); *Clement v. Redi-Bilt Corp.*, 249 So. 2d 607, 608 (La. App. 4th Cir. 1971).  Louisiana courts draw a distinction between nonperformance and negligent performance.  "Where a person neglects to do what he is obligated under a contract to do

19

([Louisiana] C[ivil] C[ode arts.] 1883, 1926–1934), he has committed a passive breach of the contract (C[ivil] C[ode arts.] 1931–1933).  If he negligently performs a contractual obligation, the courts sometimes term this as active negligence as well as an active breach of contract." *Hennessy v. S. Cent. Bell Tel. Co.*, 382 So. 2d 1044, 1045 (La. App. 2d Cir. 1980) (citing *Richardson v. Moore*, 304 So. 2d 425, 428 (La. App. 1st Cir. 1973); *Redi-Bilt*, 249 So. 2d at 608).  In *Hennesy*, for example, the court explained that the "unintentional failure of the telephone company to list a person's name in a directory does not give rise to an action in tort." *Id.* (citing *Marino v. S. Cent. Bell Tel. Co.*, 376 So. 2d 1311, 1312 (La. App. 1st Cir. 1979)).

WTI alleges that "Apache owes WTI a duty to process, account for, and properly allocate WTI's production, and a corresponding duty to maintain and/or produce documents or otherwise account for its misallocation of production to WTI." (Docket Entry No. 27, ¶ 46).  WTI alleges that "[i]n accounting for its allocations, Apache owes an independent tort duty to do so truthfully and to refrain from supplying false or misleading information." (*Id.*)  Apache likens the negligence allegations to those in *Hennessy*: a claim of nonperformance of the duties required under the parties' contract.

WTI responds that it has sufficiently pleaded that Apache actually performed under the contract in a negligent manner, causing harm to WTI.  Taking its factual allegations as true for the purpose of this motion, WTI has pleaded more than mere nonperformance of contractual obligations. WTI has pleaded that Apache "negligently perform[ed] a contractual obligation," which Louisiana courts recognize may give rise to "active negligence as well as an active breach of contract." *Hennessy*, 382 So. 2d at 1045.  Apache's motion to dismiss the gross negligence claim on the ground that it fails as a matter of Louisiana law is denied.

20

**B.      Limitations and the Remaining Tort Claims**

**1.      Limitations under Louisiana Law**

Apache argues that the remaining claims are time-barred.  Article 3492 of the Louisiana Civil Code states that the prescription period for a delictual (tort) action is one year.  This prescription period begins when "the injured party discovers or should have discovered the facts upon which his cause of action is based."  *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987).  All of WTI's tort claims (negligence, negligent misrepresentation, conversion, and fraud) are subject to article 3492's one-year prescriptive period.  *See Richard v. Wal-Mart Stores, Inc.*, 559 F.3d 341, 345 (5th Cir. 2009) (conversion); *F.D.I.C. v. Barton*, 96 F.3d 128, 133–34 (5th Cir. 1996) (negligence); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 394 (E.D. La. 1997) (fraud); *Shermohmad v. Ebrahimi*, 945 So. 2d 119, 122 (La. App. 5th Cir. 2006) (fraud); *Aetna Cas. & Sur. Co. v. Stewart Constr. Co.*, 780 So. 2d 1253, 1256 (La. App. 5th Cir. 2001) (negligent misrepresentation). Prescription ordinarily begins when a plaintiff has actual or constructive knowledge of facts sufficient to indicate to a reasonable person that he has a claim.  *Wells v. Zadeck*, 89 So. 3d 1145, 1151 (La. 2012).  In tort actions, this occurs when actual, appreciable, and nonspeculative damages are sustained.  *Nat'l Council on Comp. Ins. v. Quixx Temp. Servs., Inc.*, 665 So. 2d 120, 122 (La. App. 4th Cir. 1995); *see also* LA. CIV. CODE ANN. art. 3492.  The plaintiff bears the burden of showing that prescription has not run when the face of the petition shows that the action is time-barred.  *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994).  "[P]rescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it." *Zadeck*, 89 So. 3d at 1149.

Certain exceptions prevent the running of the prescriptive period. The doctrine of *contra non valentem* extends prescription when a plaintiff is unable to exercise his cause of action, such as when (1) some legal cause prevents the courts from taking cognizance of or acting on the plaintiff's claims; (2) there is some condition coupled with the contract or the proceedings that prevents the plaintiff from suing; (3) the defendant does something to prevent the plaintiff from bringing his cause of action; or (4) the cause of action is not known or cannot reasonably be known by the plaintiff, regardless of whether this ignorance is induced by the defendant. *See Plaquemines Parish Comm'n Council v. Delta Dev. Co.*, 502 So. 2d 1034, 1054–56 (La. 1987). Under the continuing-tort theory, "continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions." *Wilson v. Hartzman*, 373 So. 2d 204, 207 (La. App. 4th Cir. 1979). In such situations, prescription does not begin until the last act occurs or the tortious conduct stops. *See id.* at 206–07.

### 2.    The Conversion Claim

"While Louisiana's Civil Code does not identify causes of action for conversion, this remedy has been inferred from code articles." *Richard*, 559 F.3d at 345 (citing *Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So. 2d 853, 856 (La. 1998)). The one-year prescription period begins to run when the injury or damage was sustained. *See* LA. CIV. CODE art. 3492; *Johnson v. Concordia Bank & Trust Co.*, 671 So. 2d 1093, 1098 (La. App. 3d Cir. 1996).

Apache argues that all the injury caused by the alleged conversion occurred by the end of 2007 and that the conversion claim is barred because WTI did not file suit until 2011. In the second amended complaint, WTI alleges that it stopped sending its ST-229 production to Apache for processing in 2007. WTI's conversion claim is based solely on the oil Apache allegedly

misallocated during processing.  WTI did not respond to this basis for dismissal or otherwise show

that prescription had not run.  WTI has not met its burden to show that its conversion claim is not

time-barred.  *See Wimberly*, 635 So. 2d at 211.  WTI's multiple attempts to amend its pleading have

not cured the defect.  Accordingly, WTI's conversion claim is dismissed, with prejudice.[5]

### 3.    The Negligent Misrepresentation and Gross Negligence Claims

Apache argues that the negligent misrepresentation and gross negligence claims are

prescribed because WTI's complaint shows that it had actual knowledge not only of the alleged

injury, but also of the damages, by November 2007.  Under Louisiana law, the tort of negligent

misrepresentation has three elements: "(1) there must be a legal duty on the part of the defendant

to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have

caused damages to the plaintiff."  *Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co.*, 525 So.

2d 1157, 1162 (La. App. 3d Cir. 1988) (citing LA. CIV. CODE arts. 2315, 2316; *Dohmann v. United

Gas Pipe Line*, 457 So. 2d 307, 309 (La. App. 3d Cir. 1984); *Beal v. Lomas & Nettleton Co.*, 410

So. 2d 318, 321 (La. App. 4th Cir. 1982)).

"[P]rescription in actions arising ex delicto commences on the day actual and appreciable

damage is sustained."  *Aetna*, 780 So. 2d at 1256; *see also Cole v. Celotex Corp.*, 599 So. 2d 1058,

---

[5] Even if Texas law applied, WTI's conversion claim would still be time-barred.  Texas law provides a two-year statute of limitations for conversion.  TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West 2002).  For the reasons discussed above, WTI has not shown that it is entitled to equitable tolling of limitations because it had actual knowledge of its claim more than two years before it filed suit.  *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 209 (Tex. 2011) (actual knowledge precludes application of fraudulent concealment); *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 928–30 (Tex. 2011) (actual knowledge precludes application of the discovery rule); *Markwardt v. Tex. Indus., Inc.*, 325 S.W.3d 876, 894 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (actual knowledge commences statute of limitations for a continuing tort); *Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex. App.—Dallas 1994, writ denied) (same).

1063 n.15 (La. 1992) ("[A] *sine qua non* for accrual of a cause of action is damages."). Under

Louisiana law, for a party's claim to accrue, "there is no requirement that the quantum of damages

be certain or that they be fully incurred, or incurred in some particular quantum, before the plaintiff

has a right of action." *Harvey v. Dixie Graphics, Inc.*, 593 So. 2d 351, 354 (La. 1992). A party must

only have suffered some "actual and appreciable damage." *Id.*; *see also Aetna*, 780 So. 2d at 1257

("The damage need not be calculable or fully incurred but must not be merely speculative."). In

*Aetna*, for example, the court explained:

> The heart of the inquiry into constructive knowledge is the reasonableness of
> plaintiff's inaction. We concur with this analysis. The cause of action in the present
> matter arose when the first policy was issued in 1989. The record indicates that
> Aetna cancelled the policy with Stewart in 1991 alleging misrepresentation of
> payroll information. Thus, as of sometime in 1991, Aetna was aware that Stewart
> may have made certain misrepresentations on its application, which shows
> constructive knowledge sufficient to support the accrual of a cause of action. Hence
> the petition filed . . . in 1994 was untimely.

780 So. 2d at 1257 (citing *Quixx*, 665 So. 2d at 123–24).

WTI's amended complaint shows actual knowledge of damages sustained in April 2007.

WTI alleges in its second amended complaint that in April 2007, it installed a heater/treater because

of Apache's alleged misallocations. "As a result of Apache's continued over-allocations of water

and under-allocations of oil, WTI made the decision to install a heater-treater on ST-229 in April

2007." (Docket Entry No. 27, ¶ 19). The complaint also shows that WTI knew the amount of its

damages no later than November 2007. WTI alleges that it sent Apache a letter on November 2,

2007 "setting forth WTI's calculations that Apache owed WTI $9,770,192.99." (*Id.*, ¶ 23). WTI

alleges and seeks this same amount as damages in this case. (*Id.*, ¶ 40). WTI's argument that at

most it had mere "suspicions" that it might have a claim is unpersuasive. (Docket Entry No. 29, at

16). Based on its pleadings, WTI had actual knowledge of the alleged tortious acts and of the

24

resulting damages by November 2007.  This lawsuit was not filed until July 2011. WTI's tort claims are barred under Louisiana's one-year prescription period.

Tolling doctrines do not apply to save the negligence claims.  WTI invokes the third category of *contra non valentem*, which encompasses claims that "an innocent plaintiff has been lulled into a course of inaction in the enforcement of [its] right by reason of some concealment or fraudulent conduct on the part of the defendant, or because of his failure to perform some legal duty whereby plaintiff has been kept in ignorance of [its] rights." *Carriere v. Jackson Hewitt Tax Serv. Inc.*, 750 F. Supp. 2d 694, 709 (E.D. La. 2010) (quoting *Carter v. Haygood*, 892 So. 2d 1261, 1269 (La. 2005)).  "In other words, this category applies 'when the defendant engages in conduct which prevents the plaintiff from availing [itself] of [its] judicial remedies.'"  *Id.* at 710 (alterations in original) (quoting *Carter*, 892 So. 2d at 1269).  WTI also argues that the prescriptive period should be equitably tolled because despite reasonable care and diligent efforts, it did not discover its injury until after the limitations period had expired.  This fourth category of *contra non valentem*, also known as the "discovery rule," permits equitable tolling of prescription when the plaintiff "'is ignorant of the facts upon which [its] cause of action is based, as long as such ignorance is not willful, negligent or unreasonable.'"  *Id.* at 708 (quoting *Wimberly*, 635 So. 2d at 211–12).  Finally, WTI argues that the continuing-tort doctrine bars prescription.

The crux of WTI's argument is that the prescriptive period should be suspended because WTI was lulled into inaction by Apache's April 2008 letter.  The record, however, shows that during the "lull," WTI hired an independent auditor, who could not explain Apache's allocations, and WTI made a $9.7 million demand on Apache.  Both occurred notwithstanding WTI's claim that it did not

know how Apache made its allocations.  Indeed, WTI asserts it still does not know, although it has filed suit.

WTI may argue that it did not know until later that Apache was "covering up" the basis for its misallocations.  But the record precludes an argument that WTI did not believe by 2008 that Apache's allocations and related representations were grossly inaccurate.  WTI's pleading defeats the argument that it had a reasonable basis to delay suit after 2008.  *See Quixx*, 665 So. 2d at 123–24.  WTI has not carried its burden of showing that Apache lulled it into a course of inaction that kept WTI in ignorance of its rights against Apache.

Nor does the continuing-tort doctrine toll prescription.  That doctrine addresses "continuing and repeated wrongful acts" that are a single action "rather than a series of successive actions." *Wilson*, 373 So. 2d at 207.  Prescription begins to run when the last act occurs or the tortious conduct stops.  *See id.*  Even if this court were inclined to treat WTI's allegations as describing a continuing tort, the tortious conduct stopped in 2007, when Apache stopped processing WTI's oil.  WTI alleges that the *cover up* of the alleged wrongdoing continues to this day, (Docket Entry No. 29, at 26), not that Apache continues negligently to misallocate WTI's oil.

In summary, WTI's complaint shows that its negligence-based tort claims are time-barred. WTI has amended its complaint several times but has not cured this defect.  WTI has not carried its burden of establishing facts which would interrupt, suspend, or otherwise toll prescription.  WTI's negligent misrepresentation and gross negligence claims are dismissed with prejudice.[6]

---

[6] Even if Texas law applied, WTI's gross negligence and negligent misrepresentation claims would be time-barred.  In Texas, negligence and negligent misrepresentation claims must be brought not later than two years after the cause of action accrues.  *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 354 (5th Cir. 2008) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999); *HECI Exploration Co. v.*

### 4.     The Fraud Claim

The fraud claim is not subject to dismissal.  Under Louisiana law, *contra non valentem* may

extend the one-year prescriptive period of a delictual action such as fraud when "the plaintiff does

not know nor reasonably should know of the cause of action."  *In re Medical Review Panel*

*Proceeding Vaidyanathan*, 719 So. 2d 604, 607 (La. App. 4th Cir. 1998) (quotation omitted).  The

doctrine also applies when the defendant does something to prevent the plaintiff from bringing his

cause of action.  *See Plaquemines Parish*, 502 So. 2d at 1054–56.  WTI argues that it could not have

reasonably known that it had a fraud claim until 2011, when WTI uncovered internal Apache

communications suggesting knowledge that the representations to WTI were false and that Apache

was intentionally misleading WTI and concealing the truth.   Apache argues that the claim is

nevertheless prescribed because WTI actually knew that Apache had made misrepresentations, even

if WTI did not know those misrepresentations were fraudulent.  But WTI's complaint indicates more

than that.  WTI alleges that Apache took affirmative steps to conceal fraudulent intent, and that

Apache only learned about those steps shortly before it filed suit.  Based on WTI's allegations, this

court cannot conclude, as a matter of law, that WTI's fraud claim is prescribed.[7]

---

*Neel*, 982 S.W.2d 881, 885 (Tex. 1998)).  For the same reasons discussed above, WTI cannot rely
on tolling doctrine because its own complaint reveals that it had actual knowledge of its gross
negligence and negligent misrepresentation claims more than two years before it filed suit.  *See*
*Emerald Oil*, 348 S.W.3d at 209; *Shell Oil*, 356 S.W.3d at 928–30; *Markwardt*, 325 S.W.3d at 894;
*Upjohn Co.*, 885 S.W.2d at 542.

[7]  Even if Texas law applied, dismissal would be inappropriate as to WTI's fraud claim.
Fraudulent concealment is a fact-specific equitable doctrine that may extend the limitations period.
*BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011).  Under Texas law, a defendant's
fraudulent concealment of wrongdoing may toll the statute of limitations until the fraud was
discovered or could have been discovered with reasonable diligence.  *Id.*; *see also USPPS, Ltd. v.*
*Avery Dennison Corp.*, 326 F. App'x 842, 850 (5th Cir. 2009) (per curiam) (noting that while the
Texas Supreme Court has not applied the discovery rule where injured parties could have exercised

## V.      Conclusion

The motion to dismiss is granted in part and denied in part.  It is granted, with prejudice, as to WTI's conversion, gross negligence, and negligent misrepresentation claims.  It is denied as to WTI's fraud claim and requests for relief in the form of estoppel, attorney's fees, and exemplary damages.

SIGNED on January 15, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

reasonable diligence based on information or records available at the time, these cases have arisen in a summary-judgment context where the applicable standard was "whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law" as opposed to a Rule 12(b)(6) standard).  In this case, it appears that fraudulent concealment could apply to toll the limitations period for WTI's claim against Apache.  WTI alleges that the first time it learned that Apache was allegedly covering up the fraudulent nature of its misrepresentations was in 2011.  Thus, because WTI might be able to show that fraudulent concealment applies in this case to toll limitations, this court cannot find that WTI's fraud claim is time-barred as a matter of law.