**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-2931 |
| | § | |
| APACHE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

In 2005, Apache Corporation and W&T Offshore Inc. entered into a Production Handling

Agreement ("PHA") to process oil produced off the Louisiana coast.  The PHA called for W&T to

send oil from its platform, the South Timbilier 229 ("ST-229"), to Apache's platform, the Grand Isle

116 ("GI-116").  (Docket Entry No. 68, Ex. 1 ("PHA")).  Apache processed its own and W&T's oil

production on GI-116, allocating the amounts between the two companies.  W&T alleges that

Apache breached the PHA in multiple ways, including misallocating the production to favor Apache.

W&T also alleges that Apache committed fraud and other state-law torts by misrepresenting how

it made the allocations and by concealing misallocations.  (Docket Entry No. 27).

W&T filed this suit in Texas state court in July 2011.  Apache timely removed on the basis

of federal subject-matter jurisdiction under the Outer Continental Shelf Land Act ("OCSLA"), 43

U.S.C. §§ 1331, 1349(b)(1).  (Docket Entry No. 1).  Apache then moved to dismiss some of W&T's

claims.  (Docket Entry No. 19).  This court granted Apache's motion to dismiss W&T's claims for

conversion, negligent misrepresentation, and gross negligence on the basis that Louisiana law

precluded them, but denied the motion to dismiss W&T's fraud claim.[1]  (Docket Entry No. 45).

Apache filed an amended counterclaim for costs it incurred from processing W&T's production.

(Docket Entry No. 54, Ex. A).

The motions for summary judgment, and the court's rulings on them, are as follows:

- W&T moved for summary judgment that Apache breached the PHA.  (Docket Entry No. 68 at 43–44).  This motion is denied.  Apache cross-moved for summary judgment that it did not breach.  (Docket Entry No. 70 at 32–49).  This motion is granted in large part, but denied in part as well.

- W&T moved for summary judgment on damages.  (Docket Entry No. 68 at 38–41, 44).  Apache cross-moved for summary judgment that it is not liable for the damages W&T seeks.  (Docket Entry No. 70 at 6–24).  W&T's motion for summary judgment that it is entitled to damages for Apache's wrongful allocation and that these damages should be measured in at least one of three alternative methods presented is denied;  Apache's cross-motion for summary judgment that none of the three damages measures is admissible is granted, and Apache's cross-motion for summary judgment that W&T is not entitled to recover damages for costs related to installing processing equipment is granted.

- W&T moved for summary judgment that it is not liable for the damages Apache asserted in its amended counterclaim.  (Docket Entry No. 68 at 41–43).  This motion is granted.

- Apache moved for summary judgment dismissing W&T's fraud claim and W&T's claims for exemplary or punitive damages, special or consequential damages, attorneys' fees, estoppel, and an accounting.  (Docket Entry No. 70 at 21–32, 49–50).  Apache's motion is granted.

The reasons for these rulings are explained in detail below, and a status conference is

scheduled for **January 31, 2014, at 5:00 p.m.** in Courtroom 11-B.

---

[1]  The court denied Apache's motion to dismiss W&T's "claims" for estoppel, attorneys' fees, and exemplary damages on the basis that those are remedies rather than separate claims for relief and inappropriate for resolution in a motion to dismiss.  (Docket Entry No. 45 at 19).

2

## I.      Background

Apache owned and operated the GI-116 offshore oil-production platform; W&T owned and operated the ST-229 platform.  Both are located off the Louisiana coast on the Outer Continental Shelf.  Under the PHA, effective June 1, 2005, W&T sent oil produced from its well on ST-229 through a 6.6-mile subsea pipeline to Apache's processing facility on GI-116.  Production from W&T's well consisted of a mixture of oil, water, sediment, and other impurities.  The parties refer to the mixture of water, sediment, impurities using the industry acronym, "BS&W."

As part of its obligations under the PHA, W&T installed processing equipment on Apache's platform.  (*See* PHA § 2.02).  The processing equipment included separators to separate W&T's production into oil, gas, and water.  One piece of equipment was a proportional-to-flow sampler to measure BS&W in oil production.  The parties dispute whether the PHA required Apache to measure W&T's production using this type of measurement device.  W&T contends that the PHA required Apache to measure BS&W in W&T's oil production using only a proportional-to-flow sampler.  (Docket Entry No. 68 at 36–37).  Apache responds that the PHA did not require the use of a proportional-to-flow sampler, and even if it did, W&T installed the sampler incorrectly so that it did not accurately measure BS&W in W&T's production.  (Docket Entry No. 86 at 6–16).  Apache argues that any duty it had to use the sampler was conditioned on W&T's correct installation of a sampler capable of measuring BS&W accurately.  (Docket Entry No. 70 at 37–41).

On June 8, 2005, Apache submitted an application to the Department of Interior's Minerals Management Service ("MMS") asking permission to commingle its oil production with W&T's production.  (Docket Entry No. 68, Ex. 2 at 1).  In July 2005, Apache sent MMS an application to amend its June submission.  (*Id.*, Ex. 3).  The amended application stated that W&T's production

would be measured for allocation purposes using turbine meters downstream of the separators. Under the MMS regulations then in effect, when turbine meters were used to determine allocation, the samples had to be taken proportional-to-flow.  *See* 30 C.F.R. § 250.1202(k)(2).  MMS approved Apache's amended application on July 20, 2005 and confirmed the approval in writing on August 8, 2005.  (Docket Entry No. 68, Ex. 4 at 7).

On July 25, 2005, Apache began processing W&T's production on the GI-116 platform. Apache separated the oil from the BS&W and, for an additional fee, disposed of the excess water. The PHA required Apache to allocate the processed oil between itself and W&T in a "consistent and equitable manner."  (PHA § 6.11).  To make the allocation, Apache used a separator to extract the oil from W&T's production and used a turbine meter to measure that oil.  Apache then used "shakeouts" to adjust W&T's oil production for BS&W.  Shakeouts are a method of determining BS&W content by putting a sample of processed oil in a centrifuge to separate the BS&W and then measure it.  The percentage of BS&W in the sample is then subtracted from the overall oil production to determine the final allocation.

Apache measured its own production using "well tests."  Well tests are conducted by diverting oil from the usual separator to a test separator that measures the oil, water, and other materials in the oil.  The PHA required Apache to give W&T advance notice of these well tests. (PHA § 6.12).  Both sides ignored this part of the PHA.  Apache did not give W&T notice of the tests; W&T did not ask about the tests but continued to send its production to Apache.

After processing, W&T and Apache's oil was commingled and sent to an export sales pipeline.  The commingled production was metered for sales purposes at the Lease Automatic

Custody Transfer meter ("LACT").  Because the only oil flowing through the LACT was from W&T and Apache, any barrel not allocated to one was allocated to the other.

In April 2007, W&T installed a "heater treater" on its platform.  (Docket Entry No. 68, Ex. 33 at 136).  The heater treater did much of the processing work previously done on Apache's platform.  On August 1, 2007, W&T stopped sending production to Apache on a daily basis, instead sending its production to a company called Trunkline.  (*Id.*, Ex. 15 at ¶ 11).  Installing the heater treater and sending production to Trunkline meant that W&T did not need to send its oil to GI-116, which in turn allowed it to avoid paying Apache handling fees for oil and water.  (*See* PHA § 5.01).  W&T nevertheless has kept the PHA in effect and continues to send a small amount of production to Apache each month.

The PHA gave W&T the right to audit Apache's records.  (*See* PHA § 18.04).  W&T initiated an audit in October 2007 by asking Apache to provide, among other things, "Apache Daily Field Reports for GI 116."  (Docket Entry No. 68, Ex. 17).[2]  In November 2007, W&T sent Apache audit exceptions, claiming that Apache had underallocated oil that was properly W&T's, and that as a result, W&T unfairly lost (and Apache gained) oil worth $9,777,192.99.  (*Id.*, Ex. 19).  Apache responded that it disagreed with W&T's audit exceptions.  (*Id.*, Ex. 21).  Apache then sent W&T computer files containing spreadsheets of "gauge-off reports," which included BS&W measurements and meter-flow readings.  (*Id.*, Exs. 22–23).  W&T asked for additional supporting documentation but did not specify what it wanted.  (*Id.*, Ex. 24).  Apache responded that the computer files

---

[2] This section provides a brief background of W&T's audit requests and Apache's responses.  The section addressing W&T's claim that Apache breached the PHA's audit provisions describes the requests and responses in greater detail.

containing the gauge-off reports were enough to allow W&T to verify the allocations made. (Docket Entry No. 86, Ex. 30).

During the audit, Apache did not give W&T the well-test records from Apache's wells used to determine its own production. Apache recorded data from its well tests in reports called "platform morning reports" and in well-test logs. (Docket Entry No. 86, Exs. 19 (morning reports), 21 (well-test logs)). Apache has since provided W&T with these records.

On January 10, 2013, five days before the court filed its Memorandum and Order granting in part and denying in part Apache's motion to dismiss, Apache informed W&T that it had underallocated $444,020.92 worth of oil to W&T between April 2006 and July 2007. (Docket Entry No. 70, Ex. 30). Apache sent W&T a check in that amount. (*Id.*).

W&T filed suit in July 2011 in state court, asserting claims for breach of contract, unjust enrichment, negligence, fraud, and conversion. (Docket Entry No. 1, Ex. B). W&T sought actual and punitive damages, attorneys' fees, and a declaratory judgment that Apache had failed to perform its duties under the PHA and had to comply with its payment and other contract obligations. (*Id.*). Apache:

- • answered, asserting several affirmative defenses, including the statute of limitations, waiver and equitable estoppel, laches, and failure to mitigate damages, (Docket Entry No. 1, Ex. D);

- • removed the case to this court based on federal-question jurisdiction under the OCSLA, (Docket Entry No. 1); and

- • counterclaimed for damages for breach of contract and negligence or, alternatively, for the value of oil improperly allocated to W&T instead of Apache, (Docket Entry No. 17).

W&T filed a second amended complaint, asserting claims for breach of contract, negligent misrepresentation and gross negligence, fraud, and conversion, and seeking declaratory relief and an accounting, exemplary damages, and estoppel. (Docket Entry No. 27 ("SAC")). W&T also invoked the discovery rule to toll any statute-of-limitations affirmative defense Apache might raise. (*Id.* at 18–19).

Apache filed an amended counterclaim, alleging that W&T breached the PHA by failing to install processing equipment or installing it incorrectly. (Docket Entry No. 54, Ex. A at 3–4).[3] Apache also alleged that W&T sent Apache oil containing large quantities of water and other contaminants, which failed to meet the PHA's quality specifications and caused Apache to incur unnecessary costs. (*Id.*).

In July 2012, Apache moved to dismiss the second amended complaint. (Docket Entry No. 28). The court:

- granted Apache's motion to dismiss W&T's claims for conversion, negligent misrepresentation, and gross negligence on the basis that Louisiana law precluded them;

- denied the motion to dismiss W&T's fraud claim; and

- denied Apache's motion to dismiss W&T's "claims" for estoppel, attorneys' fees, and exemplary damages on the basis that those were remedies rather than separate claims for relief, and thus inappropriate to rule on in a motion to dismiss.

(Docket Entry No. 45).

After the court ruled on the motion to dismiss, W&T moved for summary judgment on its claims that Apache breached the PHA by failing to:

---

[3] The court granted Apache leave to file the amended counterclaim at the August 6, 2013 motion hearing. (Docket Entry No. 97).

- use a proportional-to-flow sampler to measure BS&W content in W&T's production;

- retain the results of all well tests;

- retain "individual well tests forms";

- comply with the PHA's audit procedures;

- provide W&T with advance notice of well tests;

- adjust its production for "flash factor" or "shrink"; and

- conduct accurate well tests.

(Docket Entry No. 68, at 43–44). Apache cross-moved for summary judgment on all claims except for the alleged failures to adjust for flash factor and conduct accurate well tests. (Docket Entry No. 70).

W&T moved for summary judgment on damages for oil Apache allegedly underallocated and for the costs of installing the heater treater, the subsea pipeline between the ST-229 and GI-116 platforms, and the other processing equipment. Apache cross-moved for summary judgment that W&T is not entitled to these requested damages.

W&T also moved for summary judgment on Apache's counterclaim, contending that it is untimely under the PHA. Apache moved for summary judgment on W&T's fraud claim and its claims for exemplary or punitive damages, special or consequential damages, attorneys' fees, costs associated with the audit, estoppel, and an accounting.

Each of the motions is addressed below.

## II.    The Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."

8

FED. R. CIV. PROC. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ." FED. R. CIV. PROC. 56(c)(1)(A).  "[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex*, 477 U.S. at 323).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case.  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Duffie*, 600 F.3d at 371 (internal quotation marks omitted).

"When the moving party has met its Rule 56[] burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Id.*  The nonmovant must identify specific evidence in the record and articulate how that evidence supports

9

that party's claim.  *Id*. (internal quotation marks omitted).  "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'"  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540

(5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"In deciding a summary judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party."  *Duffie*, 600 F.3d at 371.

### III.    W&T's Breach of Contract Claims

#### A.    The Applicable Contract-Interpretation Principles

The parties now agree that Louisiana law applies as federal law to govern this dispute.  (*See*

Docket Entry No. 45 (holding that Louisiana state law applies under the OCSLA regardless of the

parties' Texas choice-of-law provision)).  Under Louisiana law, a "contract is an agreement by two

or more parties whereby obligations are created, modified, or extinguished."  LA. CIV. CODE. ART.

1906.  "The essential elements of a breach of contract claim are (1) the obligor's undertaking an

obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure

to perform resulted in damages to the obligee."  *Favrot v. Favrot*, 68 So. 3d 1099, 1108–09.  (La.

Ct. App. 2011).  "The plaintiff has the burden of proving the damage suffered by him [w]as a result

of a breach of contract."  *First Alarm Fire Equip., Inc. v. Southland Int'l of La., Inc.*, 114 So. 3d

1168, 1172 (La. Ct. App. 2013).

"Interpretation of a contract is the determination of the common intent of the parties."  LA.

CIV. CODE ART. 2045; *see also Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010).  To determine

intent, courts first look to a contract's language.  *See Prejean*, 38 So. 3d at 279.  When the language

is not clear or explicit and thus ambiguous, courts apply the Louisiana Civil Code articles on

contract interpretation and pertinent Louisiana cases to discern the parties' intent.  *See, e.g.*, *Henry v. Ballard & Cordell Corp.*, 418 So. 2d 1334, 1339–40 (La. 1982) ("In ascertaining th[e] [contracting parties'] intention (where it cannot be adequately discerned from the contract or agreement as a whole) the circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry."); *Russell v. City of New Orleans, Dep't of Prop. Mgmt.*, 732 So. 2d 66, 70 (La. Ct. App. 1999) ("The words of the contract are not clear and explicit . . . so further interpretation may be made in search of the common intent.").

**B.    Analysis**

**1.    W&T's Claim that Apache Breached the PHA by Failing to Use a Proportional-to-Flow Sampler to Measure BS&W in W&T's Production**

Apache used the centrifugal-shakeout method to measure BS&W in W&T's production. W&T contends that this breached the PHA.  (Docket Entry No. 68 at 43).  Apache responds that the PHA did not require it to use a proportional-to-flow sampler to measure W&T's BS&W.  The parties have cross-moved for summary judgment on the issue.

Section 6.01(b) of the PHA provides the method for determining W&T's allocation.  It states:

> Total oil/condensate production for allocation purposes ("Producer's theoretical production") will be determined based on production information obtained from well tests utilizing the test separator located on the Host Production Facility prior to being commingled with Other Production.  Producer's gross barrels will be adjusted for BS&W, meter factor, temperature correction factor and flash factor to obtain net standard barrels ("Producer's net theoretical production").

(PHA § 6.01(b)).

This section does not prescribe how Apache should measure BS&W.  The lack of detail is reflected in the testimony.  Ronnie Barras, Apache's corporate representative on measurement and allocation requirements, testified that he thought Apache was supposed to measure the BS&W content in W&T's production using a proportional-to-flow sampler.  (Docket Entry No. 82, Ex. 5 at 92).  By contrast, W&T's corporate representative, Carl Carline, thought the PHA was badly drafted because it did not clearly state whether a proportional-to-flow sampler had to be used.  (*See* Docket Entry No. 91, Ex. 45 at 1 ("PHAs should always state constant sampling proportional-to-flow on allocation meters . . . .  In the attachment [to this email] is the liquid allocation breakdown.  Let us please sign no more PHAs this way.")).  The statements of Barras and Carline  are each contrary to the litigation positions their companies have taken.

The language of § 6.01(b) resolves this issue in Apache's favor.  Section 6.01(b) states that W&T's "production for allocation purposes . . . *will be determined* based on production information *obtained from well tests utilizing the test separator*."  (PHA § 6.01(b) (emphasis added)).  When well tests are used to determine production, neither MMS regulations nor any statute requires that BS&W measurements be taken proportional-to-flow.  *See* 30 C.F.R. § 250.1204.  Carline acknowledged this point.  (*See also* Docket Entry No. 91, Ex. 46 at 88).  Because the PHA states that well tests are to be used to measure W&T's BS&W content, the PHA did not require Apache to use the proportional-to-flow sampler.  The fact that Apache's measurement of W&T's production using turbine meters may have been inconsistent with § 6.01(b)'s requirement to use well tests does not determine whether the contract required Apache to use a proportional-to-flow sampler.  Ruling that the PHA required Apache to use such a sampler would add contract terms that the parties did not agree to, a result that Louisiana law prohibits.  *See Silver Dream, LLC v. 3MC, Inc.*, 519 F. App'x

12

844, 847 (5th Cir. 2013) (per curiam) (citing *Prejean*, 38 So. 3d at 279).  The PHA did not require Apache to use the proportional-to-flow sampler to measure BS&W in W&T's production.

W&T argues that reading § 2.02 and § 6.01(b) together makes it clear that Apache had to use a proportional-to-flow sampler.  Section 2.02 required W&T to install a proportional-to-flow sampler on Apache's platform.  Because such a sampler is used to measure BS&W, W&T reasons that § 6.01(b) required Apache to measure BS&W using such a sampler.  W&T's duty to install a proportional-to-flow sampler, however, does not mean that Apache was required to use the sampler as the exclusive means for measuring BS&W.

W&T's argument that Apache violated MMS regulations and therefore the PHA by not using a proportional-to-flow sampler is unpersuasive.  MMS regulations in effect at the time required production samples flowing through a turbine meter be "take[n]. . . proportional to the flow only." 30 C.F.R. § 250.1202(k)(2).  It is undisputed that Apache used turbine meters to measure W&T's production but used shakeouts rather than a proportional-to-flow sampler to measure BS&W. Apache does not dispute that this violated the MMS regulation.  Apache does dispute W&T's contention that this also breached the PHA.

W&T bases its argument that violating the MMS regulations also breached the PHA on the theory that under Louisiana law, the PHA implicitly incorporated the regulations.  W&T relies on Louisiana cases stating "that laws existing at the time of the formation of the contract are incorporated into and form a part of the contract, as though expressly written therein."  (Docket Entry No. 68 at 34 (citing *Green v. New Orleans Saints*, 781 So. 2d 1199, 1203 (La. 2000); *Bd. of Comm'rs of Orleans Levee Dist. v. Dep't. of Natural Res.*, 496 So. 2d 281, 294 (La. 1986); *Hayes*

13

*v. New Orleans VooDoo Football, Inc.*, 985 So. 2d 259, 263 (La. Ct. App. 2008); *EEJ, Inc. N. Am. Land Dev. v. H.G. Angle Co.*, 618 So. 2d 566, 567 (La. Ct. App. 1993))).

The cases W&T relies on contain boilerplate recitations of Louisiana contract law and do not involve facts or legal issues analogous to the present case. No case W&T cites involves a contention that contract performance that violates a statute or regulation necessarily breaches that contract. In *Green* and *Hayes*, the courts looked to Louisiana workers' compensation law to determine the proper method for calculating workers' compensation benefits for professional athletes who had player contracts calling for a different calculation method. *Green*, 781 So. 2d at 1203; *Hayes*, 985 So. 2d at 263. In *Board of Commissioners of Orleans Levee District*, public-bond holders argued that a Louisiana statute requiring the return of private land the government had taken for public use impaired their contract rights, in violation of the state constitution. 496 So. 2d at 296. The court stated that because the state constitution's contract clause was in effect when the plaintiffs purchased their bonds, they could assert a cause of action for an alleged violation of that part of the constitution. In *EEJ*, a property owner challenged the validity of liens recorded against its property on the basis that the lienholders did not comply with a Louisiana statute requiring written notice before filing a lien. 618 So. 2d at 567. None of these cases supports the proposition that contract performance that violates a regulation or statute necessarily constitutes a contract breach.

W&T cites two cases in which violations of statutes or regulations amounted to contract breaches, but both are distinguishable because the contracts in those cases expressly incorporated the statutes and regulations. In *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), the Supreme Court considered whether the government breached lease agreements relating to oil exploration off the North Carolina coast. The government "promised the

14

companies, among other things, that they could explore for oil off the North Carolina coast and develop any oil that they found (subject to further royalty payments) provided that the companies received exploration and development permissions in accordance with various statutes and regulations to which the lease contracts were made 'subject.'" *Id.* at 609.  The companies received the necessary permissions, but the government refused to grant the exploration permits.  The lease agreements, "made 'pursuant to' and 'subject to' OCSLA, incorporated OCSLA provisions as promises." *Id.* at 614.  There is no such language in the PHA.

In *Isadore v. Probe Offshore, LLC*, 815 So. 2d. 876, 887–88 (La. Ct. App. 2001), the court ruled that an oil-field operator was contractually obligated to comply with state environmental laws.  The contract stated that "[t]his operating agreement shall be subject to the conservation laws of the state in which the committed acreage is located, to the valid rules, regulations and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders." *Id.* at 887.  When the parties entered the agreement, Louisiana state environmental law "impose[d] a direct obligation on mineral lessees to restore the leased premise's surface." *Id.* at 888 (referring to LA. REV. STAT. 30:81).  Again, the contract in that case contained language not present in the PHA.

In both *Mobil Oil* and *Isadore*, the contracts expressly incorporated the statutory and regulatory provisions that served as the basis for the breach.  By contrast, the PHA did not incorporate the specific MMS regulation, 30 C.F.R. § 250.1202(k)(2), that W&T claims serves as the basis for Apache's alleged contract breach.  Absent such language, there is no basis to hold that violating the regulation breaches the PHA.

Fifth Circuit case law is consistent with *Mobil Oil* and *Isadore* and with this result.  Apache cites multiple cases holding that the violation of a federal statute or regulation may not form the basis of a breach of contract claim unless the contract expressly incorporates the statute or regulation.  (*See* Docket Entry No. 70 at 33–35).  The plaintiffs in the cases Apache cites attempted to create a breach of contract cause of action by making the statutes and regulations substantive contract obligations, despite the fact that the contracts did not explicitly incorporate or refer to them.  The courts rejected the attempts to create a private cause of action for conduct that violated statutes or regulations.  *See Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861, 864 (5th Cir. 2013) (rejecting the plaintiffs' argument that a bank breached a loan agreement by allegedly violating Real Estate Settlement and Procedures Act provisions, which the contract did not mention); *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 36–37 (1st Cir. 2007) (rejecting airline passengers' attempt to incorporate obligations from a federal regulation into the passenger contract, to turn a nonrefundable ticket into a refundable ticket, when the contract did not mention the regulation).  As these cases note, the defendants' statutory or regulatory duties were owed to the government, not to the plaintiff, and not under the contract.  *See Fruge ex. rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 563 (5th Cir. 2003) (recognizing that "regulations govern the parties' joint and several liabilities vis-à-vis the Government, not amongst themselves").

W&T alternatively argues that 30 C.F.R. § 250.1202(k)(2) was incorporated into the contract.  W&T cites § 1.05 of the PHA, which requires the "Producer" (W&T) to file an application with MMS to commingle the oil produced from the platforms, in addition to obtaining  other necessary permits and approvals.  (*See* Docket Entry No. 68 at 34).  Section 1.05 states that Apache was not required to accept, process, or commingle W&T's production with its own unless there was

16

regulatory authority to do so.  It makes sense that Apache would require W&T to obtain necessary permissions before accepting W&T's production.  Without such a provision, Apache would be contractually obligated to accept W&T's production even if it lacked regulatory authority to do so. But the requirement to obtain this regulatory permission is not a wholesale incorporation of the MMS regulations, as W&T argues.

Because the PHA did not incorporate 30 C.F.R. § 250.1202(k)(2), the regulation's requirement that production samples flowing through a turbine meter be measured proportional-to-flow was not a contract requirement.  This conclusion is consistent with the PHA as a whole, which takes 21 pages to set out the parties' rights and duties.  It is unlikely that the parties would silently and implicitly incorporate every applicable MMS regulation as a contract obligation, and therefore a basis for a breach of action claim, when all other aspects of the agreement are provided for in such detail.

The court grants Apache's motion for summary judgment and denies W&T's motion for summary judgment on the claim that Apache's failure to measure BS&W content in W&T's production using the proportional-to-flow sampler breached the PHA.[4]

### 2.    W&T's Claim that Apache Breached the PHA by Failing to Retain the Results of All Well Tests

Sections 6.11 and 18.04 of the PHA address the documents relating to allocation that Apache was required to retain and provide to W&T.  Section 6.11 states that "all documentation" concerning "Processor's and Producer's . . . volume allocations . . . will be forwarded to the appropriate

---

[4] It is unnecessary to address Apache's alternative argument that any duty Apache had to use the proportional-to-flow sampler was conditioned on W&T's proper installation of a sampler that was capable of handling W&T's production.

designated personnel for each of the Parties."  (PHA § 6.11).  Section 18.04 addresses record

retention and auditing procedures, providing in relevant part as follows:

> Processor agrees to retain all pertinent records relating to the
> allocation of production, results of tests, and any billing rendered
> pursuant to this Agreement for the twenty-four (24) month period
> described above (and for any additional period as may be necessary
> to permit Producer to complete any audit commenced within such
> twenty-four (24) month period).

(PHA § 18.04).

W&T argues that Apache breached §§ 6.11 and 18.04 by not retaining records of well tests

that Apache deemed inaccurate.  (Docket Entry No. 68 at 17–24, 44).  The parties have cross-moved

for summary judgment on whether Apache breached these sections.  The issue is whether the PHA

required Apache to retain records of tests it did not use to calculate allocation because it believed

they were inaccurate.  (Docket Entry No. 70, 40–45).

W&T alleged, and Apache conceded, that Apache "discarded the results of well tests that

it unilaterally deemed inaccurate."  (Docket Entry No. 68 at 18).  Apache claims that these well tests

were "abnormal or inaccurate" and "not used for allocation or other purposes."  (Docket Entry No.

86 at 19).  According to Apache, because it did not use such tests to calculate allocation, they did

not "relate to allocation" and did not need to be retained.

Neither party is entitled to summary judgment on this issue.  As to Apache's argument,

§18.04 states that Apache must "retain all pertinent records relating to the allocation of production."

Well tests that are "pertinent" to allocation are not limited to tests Apache actually used to calculate

allocation.  The well tests Apache deemed abnormal or inaccurate and did not use in calculating

allocation could be "pertinent to" allocation if they raised questions or provided information about

18

the accuracy and reliability of the well tests Apache did use.  It is unclear whether at least some of the disregarded well tests were relevant to determine the accuracy of the well tests Apache used for allocation.

On the other hand, W&T's argument is also overbroad.  If a well test was obviously inaccurate in ways that made it useless for allocation, including for determining the reliability of other tests, that test would not be "pertinent" under the PHA.  And to the extent W&T can prove that Apache discarded some tests that were "pertinent records," W&T must then prove that it suffered damages from Apache's failure to retain the tests.  *Favrot*, 68 So. 3d at 1108–09.  The present record does not permit the court to find that, as a matter of law, W&T is entitled to summary judgment on this issue.

Both W&T and Apache's summary judgment motions on Apache's failure to retain claim for all well tests are denied.

### 3. W&T's Claim that Apache Breached the PHA by Failing to Retain "Individual Well Test Forms"

W&T alleged that Apache recorded well tests on "individual well test form[s]" and that Apache failed to retain or produce these forms.  (Docket Entry No. 68 at 18).  Apache denies that such forms exist.  W&T relies on a statement by Apache employee Barras admitting that after Apache conducted a well test, it recorded the results on an "individual well test" form.  (Docket Entry No. 68, Ex. 10 at 23–24).  In response to W&T's question, "So, there's a piece of paper for each well test," Barras answered at his deposition, "That's correct."  (*Id.*, Ex. 10 at 24).  He then testified that the "paper" is stored "electronically offshore."  (*Id.*).  Apache cited testimony and a declaration from two employees who worked on the Apache platform and conducted well tests,

stating that well tests were never recorded on individual forms.  (Docket Entry No. 86, Exs. 23, 24).
According to the Apache employees, the test information was either entered directly into an electronically stored spreadsheet called a well log or entered into the platform morning reports, but not on a separate well-test form.

The summary-judgment evidence supports Apache's argument that Barras was referring to the electronic spreadsheets or well logs when he discussed individual well-test forms at his deposition.  He stated that the well-test forms were stored electronically offshore, which is where the electronic spreadsheets containing the test information were kept.  This is consistent with the testimony of the two Apache employees who conducted the well tests and stated that the well-test data was stored on electronic spreadsheets.  Apache has produced these spreadsheets.  (*Id.*, Exs. 20, 21).  W&T has not cited any evidence other than Barras's testimony even suggesting that separate individual test forms existed.

Even if Barras's testimony created a factual dispute as to whether individual well-test forms existed, Apache is nonetheless entitled to summary judgment on this issue.  W&T has not pointed to any summary-judgment evidence that it suffered damages from Apache's alleged failure to retain the individual well-test forms.  W&T has not identified or submitted evidence that the well-test data stored in the electronic spreadsheets and included in the platform morning reports, which Apache retained and produced to W&T, was incomplete.  The record shows that W&T has all the well-test data.  Summary judgment is granted dismissing W&T's claim that Apache breached the PHA by failing to retain individual well-test forms.

Apache has cross-moved for summary judgment dismissing all W&T's contract claims arising from the alleged failure to retain documents relating to allocation.  (Docket Entry No. 70 at

48–49).  Apache entitled to summary judgment on such claims except one:  there are genuine disputes of material fact regarding the alleged failure to retain records of centrifugal shakeouts conducted before May 1, 2006.[5]

The parties proffered evidence[6] at a motion hearing held on August 6, 2013 that Apache measured BS&W content in W&T's production using centrifugal shakeouts, usually eight shakeouts per day.  (Docket Entry No. 100 at 210–33).  Before May 1, 2006, Apache stated that it recorded daily BS&W measurements by hand on a piece of paper, averaged those measurements, and then included the averaged number in the platform morning reports.  Apache did not retain the papers on which it hand-recorded the individual shakeouts.[7]  (Docket Entry No. 100 at 232).  Starting May 1, 2006 and at W&T's request, Apache did record and retain individual shakeout measurements in forms called "gauge-off reports."  (*Id.* at 217).  After W&T stopped sending production to Apache, Apache reviewed the gauge-off reports and concluded that it had improperly measured BS&W in W&T's production from May 1, 2006 to July 31, 2007.  (Docket Entry No. 82, Ex. 26; Docket Entry No. 70, Ex. 30).  These improper measurements resulted in Apache underallocating 15,122 barrels to W&T.  (Docket Entry No. 82, Ex. 26 at 2).  Apache sent W&T a check for $444,020.92 to compensate for the underallocation.  (Docket Entry No. 70, Ex. 30 at 2).

The records of the shakeouts before May 1, 2006 are clearly "pertinent records relating to allocation."  (*See* PHA § 18.04).  Their pertinence is illustrated by the fact that Apache's

---

[5] It is unclear from the record if Apache began recording the BS&W measurements in April or May 2006.  The precise month Apache started recording the BS&W measurements is irrelevant to this analysis.

[6] W&T objected to some evidence proffered at the hearing, (Docket Entry No. 100 at 225), but the evidence it objected to is not relevant to this analysis.

[7] These papers are different from the individual well-test forms discussed in the previous section.

21

examination of the shakeouts taken after May 1, 2006 caused it to recalculate W&T's BS&W

content and overall allocation.  Apache discarded records of the individual shakeouts taken before

May 1, 2006.  They are unavailable to help determine if Apache's allocations between July 25, 2005

(the day W&T began sending production to W&T) and May 1, 2006 were based on incorrect BS&W

measurements.  Apache is not entitled to summary judgment on its claim that it fully met its contract

obligation to retain these records.

### 4.  W&T's Claim that Apache Breached the PHA by Failing to Provide W&T with Documents Requested During the Audit

Section 18.04 of the PHA outlines auditing procedures available to W&T.  The section

provides that:

> Upon written notice to Processor, Producer, and its auditors, contractors and representatives, shall have the right to audit Processor's accounts and records relating to the allocation of production and all billings rendered hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year. . . .  Producer shall have access at all reasonable times to the above records maintained by Processor in connection with or related to this Agreement. In this regard, Producer shall make every reasonable effort to conduct its audits in a manner that will result in a minimum of inconvenience to Processor.

Both parties have moved for summary judgment on W&T's claim that Apache's conduct in

responding to audit requests breached § 18.04.  W&T initiated the audit process on October 10,

2007, when it sent Apache a "Request for Information/Documentation."  (Docket Entry No. 68, Ex.

16).  W&T requested documents, including "Sampling reports as required by the PHA," "Daily

water production reports," "Proportional flow sampler reports," "Gas analysis reports," and

"Monthly sampling reports."  (*Id.*).  Later that month, W&T sent Apache an additional request for

"Apache Daily Field Reports for GI 116."  (*Id.*, Ex. 17).  On November 1, 2007, W&T sent Apache

an email again asking for the "daily field reports." (*Id.*, Ex. 18).  The next day, W&T sent Apache a document setting out "audit exceptions" demanding payment of $9,777,192.99. (*Id.*, Ex. 19).  This document also stated that, although W&T's auditors had requested "monthly sampling reports," Apache had not provided all such reports. (*Id.*).  The document concluded by asking Apache to provide documents showing why the exceptions were inappropriate. (*Id.*).

On April 4, 2008, Apache sent W&T a letter stating that it disagreed with W&T's $9.7 million audit exception. (*Id.*, Ex. 21).  On April 17, 2008, Apache sent W&T spreadsheets of the gauge-off reports containing the BS&W measurements and meter-flow readings. (*Id.*, Exs. 22–23).  Apache claims that these are the "daily reports" that W&T had requested. (Docket Entry No. 86 at 25).  Apache did not provide records of the well tests it used to calculate its own production.

On March 15, 2008, W&T sent a letter claiming that Apache "ha[d] not provided a single supporting document." (Docket Entry No. 68, Ex. 24).  This letter referred to a meeting between W&T and Apache representatives in which "Apache agreed to provide all schedules and documentation supporting Apache's volumes and calculations." (*Id.*).

On August 19, 2008, W&T sent Apache another letter stating that it was "waiting on supporting documentation" from Apache. (*Id.*, Ex. 25).  Apache responded by sending the same gauge-off reports and meter-flow readings it had sent on April 17. (*Id.*, Ex. 26).  W&T responded by again stating that these files were insufficient.  W&T stated that it "still need[ed] all supporting documentation including the meter tests, BS&W tests, meter readings, etc. as agreed to during the meeting." (Docket Entry No. 86, Ex. 30).

Apache sent W&T an email on September 23, 2008, stating that the gauge-off reports and meter-flow readings were "sufficient documentation to verify the calculation." (*Id.*).  The next two

years passed without the parties communicating about the audit.  In November 2010, W&T asked

Apache to provide "proportional-to-flow information and the monthly meter proving[s] or waivers."

(Docket Entry No. 68, Ex. 29).

W&T argues that Apache breached § 18.04 by not providing W&T with the tests Apache

conducted on its own wells.  But W&T has not pointed to specific requests for Apache's well-test

data.  W&T's most specific request was its second, in which it asked for "Apache Daily Field

Reports for GI 116."  (Docket Entry No. 68, Ex. 17).  Apache maintains that this request covered

only gauge-off reports and meter flows, information that Apache sent to W&T on April 17, 2008

and August 29, 2008.  (Docket Entry No. 86 at 27).

It is unclear from the summary-judgment record whether W&T's request for "Apache Daily

Field Reports for GI 116" included Apache's well tests.  Testimony from Apache's audit coordinator

illustrates the uncertainty over the meaning of "daily reports."  The audit coordinator testified,

"[H]onestly, I don't know exactly what a daily field report is."  (Docket Entry No. 68, Ex. 31 at 32).

W&T's conduct during the audit does not show that its request for daily field reports covered

Apache's well tests.  W&T specifically asked for "meter tests, BS&W tests, [and] meter readings."

(*Id.*, Ex. 30).  All this information relates to W&T's production.  This information does not allow

verification of Apache's production.  The fact that W&T asked for records that could be used to

verify its own production but not Apache's suggests that the request for "daily field reports" was not

a request for Apache's well-test data.  And when Apache stated that the gauge-off reports and meter-

flow readings were enough for W&T to verify Apache's allocation, W&T did not ask specifically

for Apache's well-test data, even though W&T knew that Apache determined its production using

well tests, suggesting that W&T was not requesting Apache's well-test data.

W&T makes the alternative argument that the PHA obligated Apache to provide W&T with the well-test data even if W&T never asked for it.  (Docket Entry No. 93 at 21).  W&T notes that the PHA does not limit Apache's production duty to documents W&T expressly asked for.  (*Id.*).  But the PHA does not require Apache to produce all records that §18.04 covers absent a specific request.  That section states that "Producer shall have access at all reasonable times to" the "accounts and records relating to the allocation of production."  (PHA § 18.04).  Section 18.04 requires Apache to give W&T reasonable access to "accounts and records relating to the allocation of production" if requested.  Section 18.04 does not appear to make each invocation of the audit procedures an obligation for Apache to produce all documents related to allocation.

Even if it is unclear whether Apache was required to produce its well-test data in response to W&T's request for "Apache Daily Field Reports," Apache is entitled to summary judgment on the claim.  W&T cannot show that it suffered damages from Apache's failure to disclose the well tests during the audit period.  *See Favrot*, 68 So. 3d at 1108–09.  Apache has provided W&T with all the platform morning reports containing the well tests.  (*See* Docket Entry No. 86, Exs. 20, 21).  W&T has the documents and records it claims Apache should have provided during the audit and has all the data it needs to verify Apache's allocations.  Summary judgment is granted for Apache dismissing W&T's claims that Apache breached the PHA by failing to comply with audit requests.

### 5.    W&T's Claim that Apache Breached the PHA by Failing to Notify W&T of Well Tests

The  PHA states that Apache "shall provide" W&T "with advance notice" of well tests, meter provings, and samplings.  (PHA § 6.12).  W&T claims that Apache's failure to provide advance notice of the well tests allowed Apache to manipulate those tests, which in turn allowed it

to underallocate oil and overallocate BS&W to W&T, all without W&T's knowledge.  It is undisputed that Apache did not give W&T advance notice of these well tests.

It is also undisputed that W&T did not ask Apache to provide notice of when it intended to conduct well tests or ask to witness tests, even though W&T knew Apache was conducting the tests frequently and regularly.  W&T has moved for summary judgment that Apache's failure to provide notice breached the PHA.  (Docket Entry No. 68 at 16–17, 44).  Apache has cross-moved for summary judgment that W&T waived its right to advance notice of tests because it never asked for notice, never asked to witness a test, and continued to send production to Apache despite not receiving notice.  Apache argues that W&T's conduct was so inconsistent with an intent to enforce the right to receive advance notice of well tests that it reasonably induced Apache into believing that the right had been relinquished.  (Docket Entry No. 70 at 41–43).

Louisiana law defines "waiver" as "'the intentional relinquishment of a known power or privilege.'"  *Home Ins. Co. v. Matthews*, 998 F.2d 305, 309 (5th Cir. 1993) (quoting *Tate v. Charles Aguillard Ins. & Real Estate, Inc.*, 508 So. 2d 1371, 1373 (La. 1987)).  The elements of waiver are: "(1) an existing legal right; (2) knowledge of the existence of that right; and (3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished."  *Arceneaux v. Amstar Corp.*, 969 So. 2d 755, 767 (La. Ct. App. 2007) (citing *Steptore v. Masco Constr. Co.*, 643 So. 2d 1213, 1216 (La. 1994)).  Only the third element is at issue here.  Because Apache is the party asserting waiver, it bears the burden of proof.  *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 388 (5th Cir. 2001).

26

W&T responds to Apache's waiver argument by pointing to the nonwaiver clause in § 22.03 of the PHA.  That section states in relevant part as follows:

> Amendment, Modification, and Waiver: This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all of the Parties, or, in the case of waiver, by or on behalf of the Party waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof shall in no manner affect the right at a later date to enforce the same.

W&T cites Louisiana cases stating that nonwaiver clauses are effective and preclude an inference of waiver.

Most of the cases that W&T relies on are over 70 years old.  *See, e.g.*, *Rex Credit Co., Inc. v. Kirsch*, 4 So. 2d 797, 798 (La. Ct. App. 1941); *Cantu v. Fenner, Beane & Ungerleider*, 160 So. 399, 404 (La. 1935); *Villiere & Co. v. Latter*, 171 So. 705, 707 (La. 1936).  The more recent majority rule is that nonwaiver provisions can be waived like any other contract provision.  13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract."); *see also Bott v. J.F. Shea Co.*, 388 F.3d 530, 534 (5th Cir. 2004) (finding that, despite the presence of a nonwaiver provision, the plaintiffs waived a contract requirement by their intentional conduct, silence, and inaction); *Zwick v. Lodewijk Corp.*, 847 S.W.2d 316, 317–18 (Tex. App.–Texarkana 1993, writ denied) ("[W]hile a nonwaiver provision may be some evidence of nonwaiver, it may itself be waived like any other contractual provision.").  "In order to establish that an antiwaiver clause is unenforceable, the party asserting

waiver must show a clear intent to waive both the clause and the underlying contract provision." 13 WILLISTON ON CONTRACTS § 39:36.

In *Bott*—one of the cases Apache cites for the proposition that a nonwaiver clause is not a substantive bar to finding waiver—the Fifth Circuit applied Texas contract law to rule that a plaintiff waived the contract's nonwaiver clause. 388 F.3d at 535.  *Bott* is instructive because Texas and Louisiana have similar waiver definitions.  *Compare id.* at 533 ("Under Texas law '[w]aiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" (alteration in original) (quoting *Sun Exploration and Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)), *with Tate*, 508 So. 2d at 1373 (defining waiver under Louisiana law as "the intentional relinquishment of a known power or privilege").

The contract in *Bott* required the defendant to provide the plaintiff with a certificate of insurance before beginning work on a construction project.  388 F.3d at 532.  The defendant gave the plaintiff two nonconforming certificates.  The defendant submitted the first certificate three weeks after the contract was signed and the second about eight months later.  *Id.* at 533.  The plaintiff accepted both without objection.  *Id.*  About a year after the contract was signed, an accident occurred that triggered the insurance policies.  *Id.*  The plaintiff argued that the defendant breached the contract by not acquiring insurance meeting the contract's requirements.  *Id.* at 531. The defendant argued that the plaintiff's acceptance of the nonconforming certificates constituted a waiver.  *Id.* at 533.  The plaintiff responded by citing a nonwaiver clause in the contract as conclusive proof that it had not waived the insurance requirement.  The Fifth Circuit rejected the plaintiff's contention, holding that it had waived the insurance requirement "by its [s]ilence and

28

inaction, for so long a period as to show an intention to yield the right . . . ." *Id.* at 534 (internal quotations and citations omitted).

The evidence of waiver in this case is even stronger than in *Bott*.  Waiver in *Bott* was established because the party invoking the antiwaiver clause had failed to object to two contract breaches in a year.  By contrast, Apache conducted over 120 well tests over a 3-year period.  W&T knew that these well tests were occurring and knew that Apache was failing to notify W&T.  W&T did not complain about the lack of notice or raise any question about the well tests.  Instead, it kept sending Apache production.  It did not assert any claim about Apache's failure to provide advance notice of the well tests until June 2012, in the second amended complaint.  (*See* SAC at ¶ 38(6)).  As a matter of law, W&T waived its right to object to Apache's failure to provide advance notice of the well tests.

Apache would also be entitled to summary judgment on the alternative basis that W&T has not pointed to summary-judgment evidence showing that it suffered damages from Apache's failure to provide advance notice of the tests.  *See Favrot*, 68 So. 3d at 1109.  W&T has not pointed to evidence that it would have visited Apache's platform and witnessed the tests had it received advance notice of them.  To the contrary, W&T knew that the well tests were occurring on a frequent and regular basis, and that the PHA allowed it to visit Apache's platform to view the tests.  W&T made no effort to do so.  (Docket Entry No. 70, Ex. 39 at 118–19).  The undisputed record evidence shows that, as a matter of law, Apache's failure to provide notice caused no damages to W&T.  Summary judgment is granted dismissing W&T's claims that Apache breached the PHA by failing to provide W&T advance notice of the well tests.

### 6. W&T's Claim that Apache Breached the PHA by Failing to Adjust for "Flash Factor" or "Shrink"

The PHA states that W&T and Apache's total production and allocations would "be adjusted for BS&W, meter factor, temperature correction and flash factor."  (PHA § 6.01(a), (b)).  W&T argues that Apache breached the contract by failing to adjust Apache's well-test volumes for flash factor and seeks summary judgment on this claim.  (Docket Entry No. 68 at 19, 44).  W&T cites testimony from its expert witness that Apache did not adjust for "shrink," which is another name for flash factor.  (Docket Entry No. 68, Ex. 14 at 25, 54, 110).

Apache does not dispute that it failed to adjust for flash factor.  (*See* Docket Entry No. 86 at 21–22).  It responds first that W&T is barred from asserting the claim because it was not in the complaint.  With respect to this argument, W&T alleged in the second amended complaint that Apache underallocated oil to W&T by not "measure[ing] produced oil and water as required by the PHA."  (SAC at ¶ 38(1)).  Adjusting for flash factor is one aspect of measuring oil production.  W&T pleaded its claim that Apache breached the PHA by failing to adjust for flash factor.  *See Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (recognizing that to state a plausible claim, "the complaint must provide more than legal conclusions, but it need not contain detailed factual allegations." (internal quotations omitted)).

Although W&T pleaded this breach of contract claim, summary judgment requires evidence raising a fact dispute as to whether Apache's failure to adjust for flash factor caused damages.  *See Favrot*, 68 So. 3d at 1108–09.  W&T has not presented or identified evidence supporting an inference that Apache's failure to adjust for flash factor resulted in Apache allocating to W&T a smaller share

of oil than W&T was entitled to.  W&T's motion for summary judgment that Apache breached the contract by failing to adjust for flash factor is denied.

### 7.   W&T's Claim that Apache Breached the PHA by Failing to Conduct Accurate Well Tests

W&T moved for summary judgment on its claim that Apache breached the PHA by performing inaccurate well tests and using those results to allocate production.  (Docket Entry No. 68, 20–21; Docket Entry No. 93 at 6–10).  W&T relies primarily on the reports and testimony of its accounting expert, Jeff Compton.  Compton's report concluded that Apache's well tests were unreliable.  (*See* Docket Entry No. 68, Ex. 15).  After the parties filed their summary-judgment motions, the court heard argument on Apache's motion to strike Compton's testimony and report. (*See* Docket Entry Nos. 97, 100).  This court granted Apache's motion to strike in part, ruling that Compton was not qualified to criticize Apache's well tests other than from an accounting perspective.  (Docket Entry No. 97).  This ruling limits the evidence supporting W&T's challenge to the accuracy of Apache's well tests.

Apache has presented evidence from its own expert, Terry Payne, that the well tests were reliable, not only from an accounting perspective but also from a technical perspective.  (Docket Entry No. 86, Ex. 49 (expert report of  Terry Payne); *see also id.* Ex. 52).  Payne reviewed Compton's work and concluded that it relied on faulty methodology, resulting in incorrect conclusions.

The record presents factual disputes material to determining whether Apache breached the PHA by conducting inaccurate well tests.  W&T's motion for summary judgment on its claim that Apache's well tests were inaccurate is denied.

31

### 8.        Summary of the Breach of Contract Claims

To summarize, W&T's motion for partial summary judgment, (Docket Entry No. 68), is denied in full.  Apache's motion for summary judgment, (Docket Entry No. 70), is granted in part and denied in part.  Summary judgment is granted in favor of Apache on W&T's claims that Apache breached the PHA by failing to use a proportional-to-flow sampler to measure BS&W content in W&T's production; failing to retain "individual well tests forms"; failing to comply with the PHA's audit procedures; and failing to provide W&T with advance notice of well tests.  W&T's claims that Apache breached the PHA in the following ways survive summary judgment:

- •    failing to retain records of well tests Apache deemed inaccurate or abnormal;

- •    failing to retain the records of shakeouts conducted before May 1, 2006;

- •    failing to adjust production for "flash factor or shrink"; and

- •    failing to conduct accurate well tests.

## IV.    W&T's Fraud Claim

Apache has moved for summary judgment dismissing W&T's fraud claim on the grounds that W&T has not made a prima facie showing of fraud and that Louisiana's one-year prescriptive period for fraud claims applies to bar relief.  (Docket Entry No. 70 at 24–32).

The elements of a prima facie case of fraud under Louisiana law are "(1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resultant injury."  *Becnel v. Grodner*, 982 So. 2d 891, 894 (La. Ct. App. 2008).  Apache argues that the summary judgment record lacks evidence that W&T relied on Apache's alleged misrepresentations, as required for a prima facie fraud claim.

W&T claims that an April 4, 2008 letter from Apache's internal auditor was fraudulent. (*See* Letter from Dona von Wenckstern to Steven Holt, Docket Entry No. 70, Ex. 8). This letter stated that Apache disagreed with the $9.7 million audit exceptions W&T asserted in its letter from November 2, 2007, (Docket Entry No. 68, Ex. 19), and that Apache was standing by its allocation of W&T's oil production. In moving for summary judgment, Apache argues that W&T did not rely on the April, 4 2008 letter because after receiving that letter, W&T continued to claim that it was entitled to the audit exceptions. If W&T had relied on the letter, Apache argues, it would have dropped its demand to be paid the $9.7 million it claimed in the audit exceptions. Instead, W&T continued to reject Apache's allocations and continued to demand payment, stating in a March 2008 letter that it would "not accept [Apache's] explanations" and that it was requesting "immediate credit." (Docket Entry No. 70, Ex. 34).

In November 2010, W&T's auditor sent an internal email stating that "[w]e still believe that our original exception is valid." (*Id.*, Ex. 35). W&T has stood on this belief and continued to press its demand for $9.7 million. Apache argues that W&T did not change its position or otherwise rely on any alleged misrepresentations contained in the April 4, 2008 letter, as a matter of law.

Even if Apache is correct in this argument, the April 4, 2008 letter is not the only basis for W&T's fraud claim. W&T also alleged and presented summary-judgment evidence that Apache knowingly misrepresented the amount of oil in W&T's production and perpetuated the misrepresentations by sending statements and invoices that Apache knew contained false information. (SAC at ¶¶ 52–53). W&T claims that it relied on the truthfulness of these statements and invoices by continuing to send production to Apache for processing. According to W&T, if it had known Apache was misrepresenting the oil allocations, it would have stopped sending

production to Apache long before August 1, 2007. These allegations and the supporting summary-judgment evidence are sufficient to overcome summary judgment on this ground.

Apache alternatively argues that Louisiana's one-year prescriptive period for fraud claims bars W&T's claim. *See* LA. CIV. CODE ART. 3492; *see also In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 394 (E.D. La. 1997); *Shermohmad v. Ebrahimi*, 945 So. 2d 119, 122 (La. Ct. App. 2006). The prescription period begins when "the injured party discovers or should have discovered the facts upon which his cause of action is based." *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987). "[P]rescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it . . . ." *Wells v. Zadeck*, 89 So. 3d 1145, 1149 (La. 2012). The plaintiff bears the burden of showing that prescription has not run when the face of the petition shows that the action is time-barred. *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994).

On August 1, 2007, W&T stopped sending its production to Apache on a daily basis. On November 2, 2007, W&T sent Apache the letter demanding $9.7 million for alleged misallocations. This is the same amount that W&T seeks to recover in this lawsuit. W&T clearly discovered in November 2007 the facts underlying its fraud claim. The one-year prescriptive period for a fraud claim related to the statements and invoices Apache sent W&T ended, at the latest, in November 2008. Apache did not file this lawsuit asserting fraud until July 2011. Absent equitable tolling, W&T's fraud claim is prescribed.

W&T contends that it is entitled to equitable tolling under the Louisiana doctrine of *contra non valentem*. This doctrine applies "when the defendant engages in conduct which prevents the plaintiff from availing [itself] of [its] judicial remedies." *Carriere v. Jackson Hewitt Tax Serv. Inc.*, 750 F. Supp. 2d 694, 710 (E.D. La. 2010) (quoting *Carter v. Haygood*, 892 So. 2d 1261, 1269 (La.

34

2005)).  It also applies when the plaintiff "is ignorant of the facts upon which [its] cause of action

is based, as long as such ignorance is not willful, negligent, or unreasonable." *Id.* at 708 (quoting

*Wimberly*, 635 So. 2d at 211–12).  W&T has not pointed to evidence raising a fact dispute as to

whether Apache's conduct or any other reason prevented W&T from filing the fraud claim before

November 2008.

In denying Apache's motion to dismiss W&T's fraud claim on the basis that the claim was

prescribed, this court noted that W&T alleged that "it could not have reasonably known that it had

a fraud claim until 2011, when [W&T] uncovered internal Apache communications suggesting

knowledge that the representations to [W&T] were false and that Apache was intentionally

misleading [W&T] and concealing the truth." (Docket Entry No. 45 at 27).  But W&T admits in its

response to Apache's summary-judgment motion that it obtained these communications "during

discovery in this lawsuit"—which is *after* it filed this suit alleging fraud.  (*Id.* at 49).  W&T cannot

claim that these communications were necessary to sue for fraud.  *See, e.g.*, *Terrebonne Parish Sch.*

*Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 885 (5th Cir. 2002) (stating that *contra non valentem* applies

"when the plaintiff is effectively prevented f[rom] enforcing his rights for reasons external to his

own will").  W&T has not identified information it acquired only after the prescriptive period

expired and before it filed this lawsuit that was necessary for it to allege fraud.

Based on the summary-judgment evidence, W&T's fraud claim is prescribed as a matter of

law.  Summary judgment dismissing W&T's fraud claim is granted.

## V.     W&T's Damages Claims

### A.     Damages for Apache's Alleged Misallocations

W&T has presented three alternative damage calculations through the report of its expert, Jeffrey Compton.  (Docket Entry No. 70, Ex. 2).  Opinion A concludes that W&T is entitled to recover $9,777,192.99, the amount W&T demanded in its audit exceptions.  (*Id.*, Ex. 2 at ¶ 24).  The basis for this conclusion is that the exceptions are deemed established because Apache did not "substantively respond" to them.  (*Id.*, Ex. 2 at ¶¶ 22–23).  Opinion B concludes that W&T is entitled to recover $8,658,055.61, based on the amount of oil W&T asserts it should have been allocated, with no reduction for BS&W content.  (*Id.*, Ex. 2 at ¶ 66).  Opinion C concludes that W&T is entitled to $4,776,240.33.  (*Id.*, Ex. 2 at ¶ 71).  Like Opinion B, this reflects what W&T contends is the proper allocation, but is adjusted for BS&W content W&T measured at its own platform, ST-229.

W&T moved for summary judgment that it is entitled to damages using one of these alternative measures, plus interest.  (Docket Entry No. 68 at 38–40, 44).  Apache has cross-moved for summary judgment that none of the damage calculations is proper.  (Docket Entry No. 70 at 6–18).  The court has concluded that W&T is not entitled to summary judgment on its liability claims.  To the extent W&T's motion for summary judgment on damages asks this court to hold that W&T is entitled to recover such damages, the motion is denied.  To the extent the motion, and Apache's cross-motion, ask this court to rule on whether damages measures W&T has submitted are valid, this court rules that none of the damages models Compton presented is sufficiently reliable to be admissible.  W&T's motion for summary judgment on the proper measure of misallocation damages is denied; Apache's cross-motion is granted.

"The measure of damages for a breach of contract is the sum that will place [the] plaintiff in the same position as if the obligation had been fulfilled."  *Ducote v. City of Alexandria*, 706 So.

2d 673, 675 (La. Ct. App. 1998) (internal quotations and citation omitted).  A court may not award damages absent definite proof.  *Jackson v. Lare*, 779 So. 2d 808, 814 (La. Ct. App. 2000).  A plaintiff must prove lost profits with reasonable certainty, not based on speculation or conjecture.  *Simpson v. Restructure Petroleum Mktg. Servs., Inc.*, 830 So. 2d 480, 484 (La. Ct. App. 2002); *First Alarm Fire Equip., Inc. v. Southland Int'l of La, Inc.*, 114 So. 3d 1168, 1172 (La. Ct. App. 2013) (citing LA. CIV. CODE. ART. 1995).  Damage calculations that are unreliable are inadmissible under Federal Rule of Evidence 702.  *See Seatrax, Inc. v. Sonbeck Int'l, Inc*, 200 F.3d 358, 371 (5th Cir. 2000); *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

### 1.    Opinion A

The $9.7 million damage calculation in Opinion A is based on the audit exceptions in W&T's November 2, 2007 to Apache.  In these exceptions, W&T requested a credit in the same amount Opinion A identifies as damages.  (Docket Entry No. 68, Ex. 19 at 2).  But W&T acknowledges that this amount overstates by millions the losses W&T actually suffered.  Compton admitted that he would have to reduce Opinion A's amount substantially to accurately reflect his determination of W&T's actual damages.  (Docket Entry No. 70, Ex. 4 at 14, 38–39 ).

Despite Compton's concession that $9.7 million substantially overstates W&T damages, W&T continues to contend that it is entitled to that amount based on the Council of Petroleum Accountants Societies ("COPAS") accounting guidelines for the oil and gas industry.  Accounting Guideline 21 ("AG-21") addresses revenue audits such as the Apache audit to which W&T excepted.  (Docket Entry No. 68, Ex. 35 at 3).  The section of AG-21 addressing an auditee's responsibilities in the audit-resolution process states that if "the Auditee fails to provide a substantive response

within one year," the auditor's exceptions "should be considered granted and adjustment expected by the Auditors." (*Id.*, Ex. 35 at 9).  AG-21 does not define "substantive response."  W&T argues that Apache never provided a substantive response to W&T's Nov 2, 2007 audit exception, and therefore the $9.7 million audit exception should be granted.  Because the COPAS Guidelines are just that—guidelines—and because the PHA did not incorporate AG-21 or COPAS, W&T's argument fails.

The PHA does not refer to AG-21 in particular or to the COPAS Guidelines in general. Article 16 of the PHA details accounting and auditing procedures but does not mention the accounting guidelines W&T relies on.  Nor does the PHA provide a basis to find an implicit incorporation of the COPAS Guidelines.  The PHA contains a merger clause stating that its terms "express and constitute the entire agreement between the parties . . . and no implied covenants or liability of any kind on the part of the Parties is created or shall arise." (PHA § 22.02).  Construing PHA § 18.04 to incorporate AG-21 would add an obligation to the contract that the parties did not agree to.

The language AG-21 uses provides additional reasons to reject W&T's argument that failing to give a substantive response to an auditor's exceptions requires deeming that exception established.  AG-21 states that it is just a "general guide."  It also states that an auditee's failure to provide a substantive response means that the exceptions "should be considered granted," and that the adjustment should be "expected by the Auditors." (*Id.*).  The precatory nature of the language in the guideline makes it improper on this record to apply it as the basis for awarding the full amount of the audit exception as the damages measure.

38

W&T's motion for summary judgment that if it prevails on liability, it is entitled to recover $9.7 million in damages is denied.  Apache's cross-motion that W&T is not entitled to recover $9.7 million in damages based on Apache's failure to make a substantive response to the audit exceptions is granted.

### 2.    Opinion B

Opinion B of Compton's report concluded that in the alternative, W&T was entitled to recover $8,658,055.61 in damages.  Compton reached this amount by allocating to W&T the total oil production flowing through the MBD-0110 meter, with no adjustment for BS&W in the oil. (Docket Entry No. 70, Ex. 2 at ¶ 65).  By not adjusting for BS&W, Opinion B treats the liquid flowing through the meter as if it was 100% oil, when both parties agree that it was a mixture of oil, BS&W, and other impurities.  The PHA required adjusting the oil allocations to account for the presence of BS&W.  Section 6.01(b) of the PHA states that "Producer's gross barrels will be adjusted for BS&W."  Compton explained that although the PHA requires deducting for BS&W, he did not do so because Apache measured BS&W using shakeouts rather than a proportional-to-flow sampler, which according to him breached the PHA.  (*Id.*, Ex. 2 at ¶ 32).  According to Compton, this alleged breach permitted him to "disallow" any BS&W charges or reductions Apache may have been entitled to.  (*Id.*, Ex. 2 at ¶¶ 30–32).  Compton relies on COPAS AG-19 for the proposition that Apache's "[f]ailure to comply with applicable agreements . . . generates audit exceptions that disallow [Apache's] charges."  (Docket Entry No. 70, Ex. 2 at ¶ 60 & n.37).

Compton's argument fails, for several reasons.  First, Compton's $8.6 million damage calculation assumes that the PHA required Apache to measure the BS&W content in W&T's production using a proportional-to-flow sampler.  Counsel for W&T conceded during the August

6, 2013 hearing that the $8.6 million "number is out the door" if Apache had no contractual obligation to use the proportional-to-sampler. (Docket Entry No. 100 at 82). The PHA did not require Apache to measure W&T's production using a proportional-to-flow sampler. Second, as noted above, the PHA did not incorporate the COPAS Guidelines; neither AG-21 nor AG-19 was a contract term. AG-19 is also inapplicable because it pertains to expenditure audits, not revenue audits like the audit to which W&T excepted. (Docket Entry No. 70, Ex. 11 at 1). Third, Opinion B, like Opinion A, would provide W&T with windfall damages. It is undisputed that W&T's production contained substantial amounts of BS&W. Measurements W&T took at its own platform showed that on average BS&W made up 28.55% of W&T's production. (*Id.*, Ex. 4 at 25). Failing to adjust for BS&W would overallocate approximately 200,000 barrels to W&T. (*Id.*, Ex. 4 at 196). Such a result goes beyond making W&T whole for any misallocation. *See Ducote*, 706 So. 2d at 675.

Apache's motion for summary judgment that the $8.6 million damage calculation in Opinion B is an improper measurement of damages is granted. W&T's motion that the $8.6 million is a valid measure of damages is denied.

### 3.    Opinion C

Compton's report included a third alternative damage figure that adjusted W&T's production for BS&W. Rather than using Apache's BS&W measurements, Compton adjusted W&T's production using shakeouts that W&T took on its own platform, ST-229. (Docket Entry No. 70, Ex. 2 at ¶ 69). Compton did not explain why W&T's shakeouts were more reliable than Apache's.

The shakeouts W&T took on its platform averaged 28.55% BS&W. (*Id.*, Ex. 4 at 26–27). Compton adjusted W&T's production by 28.55% and concluded that Apache owed W&T

$4,776,240.33.  Compton examined Apache's well tests, but he did not use them in his calculations because he believed they were "incomplete and inconsistent."  (*Id.*, Ex. 2 at ¶ 49).  Apache contends that the PHA precludes Compton's methodology and that he reached an absurd result.

Apache argues that Compton's failure to use Apache's well tests in damage calculations violates § 6.01(c) of the PHA.  Section 6.01(c) states that "Other Production," which includes Apache's production, "will be determined based on production information obtained from well tests."  (PHA § 6.01(c)).  Apache argues that the PHA bars using an allocation determination that fails to use its own well-test data.  (Docket Entry No. 70 at 15).  This argument is unpersuasive because § 6.01(c) does not require using only Apache's well tests to allocate production between Apache and W&T.  The PHA does not bar W&T from presenting a damage calculation based on its own well tests provided that it explains why it rejected the Apache well tests as inaccurate. Compton at least presents such an explanation.

Apache is nevertheless entitled to summary judgment because the method Compton used to reach the $4.7 million damage calculation produces results that are incorrect, and as a matter of law, unreliable.  Apache has presented uncontroverted evidence that there are at least 39 days in which Compton's calculation method resulted in W&T's total production exceeding the total combined production of W&T and Apache that was actually measured at the LACT meter.  (Docket Entry No. 70, Ex. 4 at 53–55).  This is an impossible result.  To avoid this, Compton capped W&T's daily allocations at 100% of the volume measured at the LACT meter.  (*Id.*, Ex. 2 at ¶ 61).  This meant that Compton did not allocate any production to Apache on those days even though it is undisputed

that Apache's wells were producing throughout the period.[8]  A damages calculation that reaches

such results is unreliable as a matter of law and inadmissible under Federal Rule of Evidence 702.

*See  Curtis*, 174 F.3d at 668.

W&T's motion for summary judgment that it is entitled to $4.7 million in damages if it

succeeds in showing that Apache is liable for misallocation is denied.  Apache's motion for

summary judgment that Compton's third alternative damages measure, resulting in a $4.7 million

damages amount, is unreliable and inadmissible, is granted.  W&T may not rely on any of the

damages-calculation methods or opinions presented in Compton's report.

### B.     W&T's Damages Claims for the Costs of the Heater Treater, Pipeline, and Processing Equipment

W&T moved for summary judgment on its claim that Apache is liable for the costs of

installing the pipeline between ST-229 and GI-116, a heater treater on ST-229, and other processing

equipment.  (Docket Entry No. 68 at 40–41, 44).  Apache seeks $1,114,397.58 for the cost of the

heater treater and $8,646,669.70 for the costs of the pipeline and processing equipment.[9]  (*Id.*).

Apache has moved for summary judgment denying these damage claims.  Apache is entitled to

summary judgment because as a matter of law, W&T cannot prove that Apache's alleged breaches

either caused it to install the heater treater, pipeline, or other processing equipment, or  resulted in

damages.

---

[8]  Counsel for W&T claimed at the August 6, 2013 hearing that Apache's lack of production on these 39 days may be due to the fact that it stored its production in tanks located on the GI-116 platform.  (Docket Entry No. 100 at 86–87).  W&T has not cited any summary-judgment evidence supporting this assertion.

[9]  Apache argues that W&T overstates these costs.  Any disputes that exist as to costs do not affect this analysis.

The heater treater W&T installed on its platform removed BS&W, emulsion, and other impurities from its production. W&T claims that Apache's breaches of the PHA forced it to install the heater treater. The summary-judgment evidence shows, however, that W&T installed the heater treater so it could send its production to a company called Trunkline, bypassing the pipeline between ST-229 and GI-116 and increasing its profit margins. A November 2006 internal document from W&T employee Mike Melancon seeking permission to purchase the heater treater stated that the heater treater would increase W&T's profits by $7.00 per barrel and would eliminate the $1.00 per barrel fee for oil and the $1.00 per barrel fee for water that Apache charged to handle W&T's production. (Docket Entry No. 70, Ex. 24 at 3). Melancon expected the heater treater to pay for itself within three months. (*Id.*). Apache's expert witness, Terry Payne, concluded that installing the heater treater and sending production to Trunkline rather than Apache increased W&T's profits more than $12 million. (*Id.*, Ex. 17 at 24). Installing the heater treater and contracting with Trunkline would also allow W&T to cancel the PHA. (*Id.*, Ex. 24 at 3). W&T claims that Payne relied on "incorrect and highly questionable production information" but does not point to summary-judgment evidence showing why the information is unreliable or showing that the heater treater was not profitable. (*See* Docket Entry No. 82 at 44).

Apache is entitled to summary judgment because W&T has not presented evidence raising an inference that it installed the heater treater in response to Apache's alleged breaches of the PHA. The only summary-judgment evidence on this issue—Melancon's Authorization for Expenditure seeking permission to buy the heater treater—shows that W&T installed it to increase profits by sending production to Trunkline. W&T cannot establish any causal link between Apache's alleged breaches and the installation of the heater treater.

Apache is alternatively entitled to summary judgment because W&T cannot show that it suffered damages from its decision to install the heater treater.  *See Favrot*, 68 So. 3d at 1108–09. To the contrary, as Melancon predicted, W&T's profit margins increased.  Regardless of W&T's reasons for installing the heater treater, it saved more costs and generated more profits than W&T would have received if it had sent its entire production to Apache.  Summary judgment dismissing W&T's damages claim for the cost of the heater treater is granted.

As to the damages claim for the pipeline and other processing equipment, W&T contends that Apache's alleged breaches of the PHA prevented it from realizing the "full benefit of its bargain."  (Docket Entry No. 82 at 41).  W&T does not point to summary-judgment evidence supporting this contention.  Despite W&T's claims that Apache committed fraud and multiple breaches of the PHA, W&T continues to pay Apache roughly $10,000 each month to keep the PHA in effect.  W&T also continues to send some production to Apache each month and could send more. W&T claims that the fact it sends only a "fraction" of production to Apache evidences its damages. (*Id.*).  But the record shows that W&T makes more money sending production to Trunkline than to Apache.  Internal W&T emails reveal that it keeps the PHA in place and retains the right to send production to Apache as an "insurance policy" in case Trunkline rejects W&T's production. (Docket Entry No. 70, Ex. 33).  W&T acknowledged "that the risk of having [its] oil rejected . . . is real and higher than normal."  (*Id.*).  If Trunkline rejects W&T's production and W&T cannot route production through GI-116, W&T would be "shut in" and unable to sell its oil.  (*Id.*).  Paying the PHA monthly fees and maintaining access to the pipeline between ST-229 and GI-116 hedges against the risk of Trunkline rejecting W&T's production.  (*See id.* (W&T internal email stating that W&T "viewed the PHA fee as a cost to maintain the alternative route [through GI-116] which

44

seemed worth it due to the incremental revenue and risk associated with it")).  W&T realized and continues to realize the benefits of the pipeline and processing equipment it installed.

Additionally, W&T's claims for the costs of the pipeline and processing equipment suffer the same causation problems as its claim for the costs of the heater treater.  W&T has not pointed to summary-judgment evidence raising a factual dispute as to whether W&T stopped sending production to GI-116 for business reasons as opposed to the alleged breaches of the PHA.  Summary judgment dismissing W&T's damages claims for the costs of the pipeline and other processing equipment is granted.

### C.    W&T's Ability to Recovery Punitive Damages and Corresponding Attorneys' Fees, Incidental Damages, and Special or Consequential Damages

Apache moved for summary judgment on W&T's claims for punitive damages and attorneys' fees associated with seeking those punitive damages.  (Docket Entry No. 70 at 21–22).  Under Louisiana law, a plaintiff may not recover punitive damages unless they are authorized by statute. *Albert v. Farm Bureau Ins. Co.*, 940 So. 2d 620, 622 (La. 2006); *Int'l Harvester Credit Corp. v. I.T. Seale*, 517 So. 2d 1039, 1041 (La. 1988).  Louisiana law does not permit punitive damages in breach of contract cases.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 54 (1991) ("Under Louisiana law, there can be no punitive damages for breach of contract, even when a party has acted in bad faith in breaching the agreement.").  And no Louisiana statute permits the recovery of punitive damages for fraudulent conduct of the type W&T alleged that Apache engaged in.  *See* John W. deGravelles & J. Neale deGravelles, *Louisiana Punitive Damages—A Conflict of Traditions*, 70 LA. L. REV. 579, 586–89 & n.56 (2010) (collecting Louisiana statues providing for punitive damages and penalties).  W&T did not respond to Apache's arguments that Louisiana law provides no basis for punitive

damages in this case.  (*See* Docket Entry No. 82 at 41–46).  Summary judgment dismissing W&T's

claim for punitive damages is granted.  W&T's corresponding claim for attorneys' fees related to

those punitive damages is dismissed as well.

Apache also moved for summary judgment that W&T cannot recover incidental, punitive,

and consequential or special damages on the ground that the PHA expressly prohibits recovery of

such damages.  (Docket Entry No. 70 at 21–23).  Section 22.06 expressly and emphatically limits

recovery for breach to actual damages.  In capitalized and bolded print, § 22.06 provides:

> <u>No consequential damages</u>.  Each party (I) agrees that only actual
> damages shall be recoverable by it against any other party . . . and (II)
> hereby waives any right to recover special, punitive, consequential,
> incidental or exemplary damages, loss of production or lost profits
> (whether based on statute, contract, tort or otherwise, and whether or
> not arising from any party's sole, joint or concurrent negligence, strict
> liability or other fault) from or against any other party. . . .

(PHA § 22.06).

W&T seeks to avoid § 22.06's bar on consequential damages by arguing that Louisiana Civil

Code article 2004 nullifies the effect of § 22.06.  W&T does not argue that Article 2004 applies to

the § 22.06 bars on incidental and punitive damages.

Article 2004 states that "any clause is null that, in advance excludes or limits the liability of

one party *for intentional or gross fault* that causes damage to the other party."  LA. CIV. CODE ART.

2004 (emphasis added).  Gross fault is "akin to intentional fault and fraud." *Occidental Chem. Corp.*

*v. Elliott Turbomachinery Co.*, 84 F.3d 172, 177 (5th Cir. 1996).  A plaintiff invoking Article 2004

must show conduct that is "substantially and appreciabl[y] higher in magnitude than ordinary

negligence." *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th

Cir. 2001) (applying LA CIV. CODE. ART. 2004); *cf. Bd. of Sup'rs of La. State Univ. v. La. Agr. Fin.*

46

*Auth.*, 984 So. 2d 72, 80 (La. Ct. App. 2008) (holding that "bad faith" within the meaning of Article 1997 "generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties").

W&T argues Article 2004 applies here because Apache breached the PHA intentionally and in bad faith. (Docket Entry No. 86 at 45). W&T cites evidence that Apache's lead operator on GI-116, the area foreman, and the auditor did not read the PHA. W&T also cites Apache's to failure produce records of Apache's well tests during the audit period. This evidence, however, does not raise or support an inference that Apache's alleged breaches were intentional or in bad faith. W&T has not identified any basis to suggest that the failure of employees to read a sophisticated master agreement means that the company intended to breach the agreement. With respect to Apache's alleged failure to produce records of the well tests, it was unclear whether W&T's request for "Apache Daily Field Reports for GI 116" even covered well-test data. Even if Apache had a duty to disclose the well-test data during the audit—which is unclear from the summary-judgment record—any failure to disclose was not in bad faith given the ambiguity of W&T's request. The PHA's bar on the recovery of consequential damages applies. Apache's motion for summary judgment dismissing W&T consequential damages claim is granted.[10]

### D.    W&T's Claim for Audit Costs

Apache also moved for summary judgment dismissing W&T's damages claim for costs associated with the audit. The PHA states that Apache "shall bear no portion of [W&T's] audit costs. (PHA § 18.04). W&T contends that § 18.04's bar on the recovery of audit costs is nullified

---

[10]   Because Louisiana Civil Code article 2004 does not apply, the court need not address Apache's argument that W&T is procedurally barred from asserting it.

under Article 2004.  (*See* Docket Entry No. 82 at 45 n.170).  For the reasons explained above, W&T may not use Article 2004 to nullify the PHA's bars on recovering audit costs.  Summary judgment dismissing W&T's claims for audit costs is granted.

### E.    W&T's Claims for Estoppel and an Accounting

W&T asserted causes of action for estoppel and an accounting.  (SAC at ¶ 69–61 (estoppel); *id.* at ¶ 62 (accounting)).  As to estoppel, W&T's complaint does not differentiate between equitable estoppel and promissory estoppel, but it appears to refer to the defensive doctrine of equitable estoppel.  (*See* SAC at ¶ 61 ("Apache should be estopped from presenting any new records or taking any position inconsistent with the information produced . . . in connection with the audit.")).  Equitable estoppel does not create a cause of action under Louisiana law.  *Young v. New Orleans Pub. Serv.*, 35 So. 2d 881, 884 (La. Ct. App. 1948); *see also Metcalf v. Deutsche Bank Nat'l Trust Co.*, No. 3:11–cv–3014, 2012 WL 2399369, at *8 n.14 (N.D. Tex. June 26, 2012) ("Equitable estoppel is not a cause of action but may be asserted as a defensive plea to bar a defendant from raising a particular defense." (quoting *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 n.1 (Tex. 2004))).  Summary judgment dismissing W&T's affirmative claim for estoppel is granted.

The second amended complaint's seventh stated cause of action is for an accounting.  An accounting may be either a suit in equity or a remedy.  *Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 737 (E.D. Tex. 2011); *see also Foreman v. Pelican Stores*, 21 So. 2d 64, 69 (La. Ct. App. 1944) (recognizing that an accounting may be a suit in equity).  The complaint merely states that it "seeks an accounting."  (SAC at ¶ 62).  To the extent W&T is seeking an accounting as a suit in equity to obtain information, summary judgment dismissing the claim is granted, because the record shows that Apache has produced the necessary information.  To the extent W&T is seeking an

48

accounting as a remedy if liability arises, that issue has not yet arisen.  Summary judgment on this claim is denied.

### F.    W&T's Damages Claim for Judicial Interest

W&T also seeks judicial interest on any damages it recovers.  (Docket Entry No. 68 at 35). Because W&T is not entitled to summary judgment on its liability theories, its entitlement to judicial interest has not yet arisen.  Summary judgment on this claim is denied at this time.

## VI.   W&T's Motion for Summary Judgment Dismissing Apache's Counterclaim

In its amended counterclaim, Apache alleged that W&T's production contained large amounts of water, paraffin, sand, mud, emulsion, and other contaminants, making processing more difficult and requiring Apache to inject chemicals into the production.[11]  (Docket Entry No. 54, Ex. A).  Apache alleged that had W&T complied with §§ 2.02, 13.01, and 8.01 of the PHA, W&T's production would not have contained as many impurities, and Apache would not have needed to inject the chemicals.  Apache seeks the cost of the chemicals as damages for W&T's breach.  W&T has moved for summary judgment dismissing Apache's amended counterclaim on the ground that the PHA bars the damages Apache seeks.  (Docket Entry No. 68 at 30).

Section 2.02 of the PHA required W&T to install certain processing equipment on Apache's platform.  This requirement included installing additional processing equipment that may have been necessary in light of quality changes in W&T's production.  (PHA § 2.02).  Section 13.01 states that W&T's production had to meet the quality specifications for the pipelines and parties taking custody of the oil at the LACT meter.  (PHA §13.01).  W&T had to install "[a]ny additional processing

---

[11]  The court granted Apache leave to file the amended counterclaim at the August 6, 2013 motion hearing. (Docket Entry No. 97).

facilities, chemicals or services required in order for [its] Well Production to meet such specifications." (*Id.*).  Section 8.01 required W&T to notify Apache of changes in production, including increases in sand and other impurities, that could affect Apache's processing.  (PHA §8.01).  Apache contends that W&T breached these contract provisions and counterclaims for damages incurred as a result.

W&T contends that the PHA bars Apache from recovering the damages it seeks.  Section 18.01 states that Apache will invoice W&T for "the processing fees and any other charge required by this Agreement."  (PHA § 18.01).  Section 18.03 states that any invoices Apache sent W&T "shall be presumed to be conclusively true" unless Apache filed a written exception within 24 months after  the end of the calendar year the invoices were filed.  (PHA § 18.03).  If Apache filed a written exception within this period, it could seek a "favorable adjustment."  (*Id.*).  If Apache did not file an exception, it could not seek an adjustment.  W&T argues that Apache's claims for the costs of the chemicals are "processing fees" and "charge[s] required by the Agreement," and barred by the 24-month deadline for filing exceptions under § 18.03.  (Docket Entry No. 68 at 42–43).

Apache responds that there is a distinction between processing fees and charges under the PHA, and damages resulting from a breach of the PHA.  (Docket Entry No. 86 at 47).  According to Apache, while processing fees and charges are subject to § 18.03's 24-month period for raising exceptions, damages from a breach are not subject to this time limit.  (*Id.*).  Apache's argument is unpersuasive when, as here, the breach-of-contract damages sought are processing fees and charges allegedly caused by a contract breach.  Any obligation W&T had to reimburse Apache for the costs of the chemicals used to treat W&T's production was both a "charge" under the PHA and damages

50

for W&T's breach of its obligations under the PHA.  Apache's failure to include the cost of the chemicals in the invoices it sent W&T within the 24-month adjustment period bars it from seeking this additional cost in the form of damages for breach of contract.  Summary judgment dismissing Apache's counterclaim is granted.

## VI.    Conclusion

The court grants in part and denies in part W&T's and Apache's motions for summary judgment.  The court denies W&T's summary-judgment motion on its claims that Apache breached the PHA.  The court grants Apache's motion for summary judgment on W&T's claims that Apache breached the PHA by failing to:

- use a proportional-to-flow sampler to measure BS&W content in W&T's production;

- retain "individual well-test forms";

- respond adequately to audit requests; and

- provide W&T with advance notice of well tests.

W&T's claims that Apache breached the PHA in the following ways survive summary judgment:

- failing to retain records of well tests Apache deemed inaccurate or abnormal;

- failing to retain the records of shakeouts conducted before May 1, 2006;

- failing to adjust production for "flash factor or shrink"; and

- failing to conduct accurate well tests.

Apache's motion for summary judgment dismissing W&T's fraud claim is granted.  As to W&T's damage claims, Apache's motion for summary judgment that the three measures of misallocation damages Compton proffered are inadmissible is granted.  Apache's motion for summary judgment  that W&T is not entitled to damages for: (1) the costs of installing the pipeline

between ST-229 and GI-116, for  the costs of installing a heater treater on ST-229, or for the costs

of installing other processing equipment; (2) for punitive damages and corresponding attorneys'

fees; (3) for incidental damages and for special or consequential damages; and (4) for audit costs is

granted.  Apache's motion for summary judgment that W&T is not entitled to an affirmative cause

of action for estoppel or an accounting as a suit in equity to obtain additional information is also

granted.  W&T's claims for an accounting as a remedy, and for judicial interest, are not dismissed.

W&T's motion for summary judgment dismissing Apache's counterclaim is granted.

 A status conference is scheduled for **January 31, 2014, at 5:00 p.m.** in Courtroom 11-B.

 SIGNED on January 16, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge